UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

**Formatted:** Spanish (Argentina)

In re:                                          Chapter 11

ELCOM HOTEL & SPA, LLC and                      Case No.  13-10029-BKC-RAM
ELCOM CONDOMINIUM, LLC,                         Case No.  13-10031-BKC-RAM

        Debtors.                                (Jointly Administered)

_____/

FIRST AMENDED DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION OF ELCOM HOTEL & SPA, LLC
AND ELCOM CONDOMINIUM, LLC

KOZYAK TROPIN & THROCKMORTON, P.A.
Corali Lopez-Castro, Esq.
Vincent F. Alexander, Esq.
2525 Ponce De Leon Blvd., 9th Floor
Miami, Florida 33134
Tel: (305) 372-1800
Fax: (305) 372-3508
Email: clc@kttlaw.com
       vfa@kttlaw.com

Counsel for Debtors and Debtors-In-Possession

Dated: ~~October 17,~~November ___, 2013

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OF THE PLAN.  ACCEPTANCE MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT UNDER SECTION 1125 OF THE**

4233.101/~~348575.4~~349713.3

**BANKRUPTCY CODE.  THE FORM OF DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE BANKRUPTCY COURT, BUT HAS NOT BEEN APPROVED.**

Elcom Hotel & Spa, LLC ("**Elcom Hotel**") and Elcom Condominium, LLC ("**Elcom Condo**"), as debtors and debtors-in-possession in the above referenced bankruptcy cases (the "**Debtors**"), file this disclosure statement (the "**Disclosure Statement**") pursuant to 11 U.S.C. § 1125 and Fed. R. Bankr. P. 3016(b) and (c), in conjunction with the Joint Plan of Liquidation of Elcom Hotel & Spa, LLC and Elcom Condominium, LLC (the "**Plan**"). A copy of the Plan is attached hereto as Exhibit "A" and is incorporated herein by reference. All capitalized terms not defined in the Disclosure Statement shall have the definition set forth in the Plan and attachments thereto.

I.    **INTRODUCTION**

The Debtors, Florida limited liability companies, each filed voluntary petitions for relief under Chapter 11, Title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**" or "**Code**") in the United States Bankruptcy Court for the Southern District of Florida, Miami Division (the "**Bankruptcy Court**") on January 2, 2013 (the "**Petition Date**"). Elcom Hotel's case number is 13-10029-BKC-RAM, and Elcom Condo's case number is 13-10031-BKC-RAM. The cases are being jointly administered under lead case number 13-10029-BKC-RAM.

A.    **Overview of Chapter 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, Chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code. The commencement of a Chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the commencement of the Chapter 11 case. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a debtor in possession. **As a result of various factors described more fully herein, the Debtors believe that the Plan is in the best interests of the Debtors' creditors.** To fairly and expeditiously distribute the Debtors' assets consistent with the Bankruptcy Code, the Debtors have proposed the Plan. Prior to soliciting acceptances of a proposed Chapter 11 plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan. This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

B.    **The Purpose and Effect of the Plan**

The Plan provides for the monetization and distribution of the assets of the Debtors for the benefit of holders of Allowed Claims. The assets will be distributed to holders of Allowed Claims on or after the Effective Date of the Plan. In order to effectuate the Distributions, the Plan provides that all of the assets of the Debtors' Estates (including Causes of Action not expressly released under the Plan) shall vest in the Trust. The Trust shall continue in operation in order to monetize the remaining assets, continue litigation, and potentially pursue litigation against other parties, and make Distributions under the Plan. ~~The Plan Administrator~~The Liquidating Trustee chosen by the Debtors and approved by the Bankruptcy Court shall be appointed on the Effective Date of the Plan and shall be responsible for implementing the Plan.

The Debtors believe that the Plan maximizes recoveries for holders of Allowed Claims and strongly recommends that you vote to accept the Plan (if you are entitled to vote). The Debtors believe that any alternative to confirmation of the Plan, such as conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, or attempts by other parties in interest to file competing plans, would result in significant delay, litigation, and additional costs, and, ultimately, would lower the recoveries for all holders of Allowed Claims.

**C.      Purpose of Disclosure Statement**

The purpose in providing this Disclosure Statement is to provide Creditors with adequate information about the Plan to enable such Creditors to make an informed judgment on the merits of the Plan.

This Disclosure Statement does not replace the Plan and therefore Creditors are urged to carefully read both the Plan and this Disclosure Statement and consult with counsel concerning the impact that these documents have upon any Creditor's legal rights. Any descriptions of legal principles contained in this Disclosure Statement do not constitute a legal opinion and may not be relied upon by any Creditors or other party in interest.

The Debtors submit this Disclosure Statement to all known Creditors and Equity Holders of the Debtors whose Claims are affected under the Plan. The purpose of this Disclosure Statement is to present all information necessary to satisfy the requirements of the Bankruptcy Code and to enable Creditors and Equity Holders to make and form prudent decisions in exercising their rights to accept or reject the Plan. By approving this Disclosure Statement, the Court neither recommends acceptance nor rejection of the Plan. The hearing on the Disclosure Statement is to determine whether the Disclosure Statement contains "adequate information" as that term is defined in 11 U.S.C. §1125(a)(1), and approval of same is not tantamount to a decision by the Court on the merits of the Plan.

The Debtors believe that the Plan provides the quickest recovery to creditors and will maximize the return to creditors on their Claims. **ACCORDINGLY, THE DEBTORS URGE ALL CREDITORS TO VOTE IN FAVOR OF THE PLAN.**

**D.      Source of Information Contained in the Disclosure Statement**

The information contained in this Disclosure Statement has been developed based upon the Debtors' thorough review and analysis of the records available at the Real Property when the Debtors and Algon replaced the Receiver on or about January 14, 2013, and their business, affairs, and financial condition. Except as otherwise expressly indicated, the information contained in this Disclosure Statement has not been subject to audit by independent certified public accountants or independent review. The Debtors believe the information contained in this Disclosure Statement is substantially accurate and may be relied upon in formulating a decision to accept or reject the Plan. The books and records of the Debtors are not warranted or represented to be complete and historically accurate.

The Plan filed in connection with this Disclosure Statement is an integral part of the Disclosure Statement and each Creditor is urged to review the Plan prior to casting its vote.

All information herein is set forth as required pursuant to 11 U.S.C. § 1125 and is not to be construed as a representation of the Debtors.

**E.    Explanation of the Chapter 11 Case and the Plan Confirmation Process**

The Plan sets forth the means for satisfying Claims against the Debtors under Chapter 11 of the Bankruptcy Code. Chapter 11 does not require that each holder of a claim against a debtor vote in favor of a plan in order for a bankruptcy court to confirm a plan. A plan must be accepted, however, by the holders of at least one "impaired" class without considering claims of an "insider" within the meaning of the Bankruptcy Code. A holder of an impaired Claim, as defined in 11 U.S.C. § 1124, or Interest is entitled to vote to accept or reject the Plan if such Claim or Interest has been allowed under Section 502 of the Bankruptcy Code. In order for an impaired Class of Creditors or Class of Interests to be deemed to have accepted the Plan, a majority number of holders of Claims and two-thirds in dollar amount of the total Allowed Claims or Interests actually voting in the Class must vote in favor of the Plan.

Even if all Classes of Claims and Interests accept the Plan, the Court may not confirm it under certain circumstances. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation. Among other things, that section requires that the Plan be in the best interest of Creditors and Interests and that the value to be distributed to Creditors and Interests be not less than the value those parties would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

The Court may confirm the Plan even though less than all of the Classes of impaired Claims or Interests accept it, so long as one Class of impaired Claims or Interests (excluding insider Claims) accepts the Plan. Confirmation of the Plan over the objection of one or more Classes or Claims or Interests is generally referred to as "Cramdown." The circumstances under which the Court may confirm the Plan over the objection of a Class of Claims or Interests are set forth in Section 1129(b) of the Bankruptcy Code (the "**Cramdown Provisions**"). The Plan may be confirmed under the Cramdown Provisions, if, in addition to satisfying the usual requirements of Section 1129 of the Bankruptcy Code, it (i) does not discriminate unfairly, and (ii) is fair and equitable with respect to each Class of Claims or Interests that is impaired under, and has not accepted, the Plan. 11 U.S.C. § 1129(b).

For purposes of seeking confirmation under the Cramdown Provisions, should that alternative be necessary, the Debtors reserve the right to modify or vary the treatment of any Class, as provided in the Plan. Confirmation of the Plan is binding upon the Debtors, all Creditors, all Interests, and all other parties in interest, regardless of whether or not they have accepted the Plan.

**F.    Procedure for Filing Proof of Claim and Proof of Interest**

The General Bar Date for filing a Proof of Claim or Proof of Interest was May 7, 2013 (the governmental bar date for filing a proof of claim was July 1, 2013). If a Creditor is listed in the Debtor's Schedules of Assets and Liabilities as holding non-contingent, liquidated and undisputed Claims in an amount certain, that Creditor was not required to file a Proof of Claim

and may therefore have elected not to file such a Proof of Claim. The Debtors' Schedules of Assets and Liabilities are on file at the Court and are available for inspection during regular business hours.

       **G.**       **Treatment of Claims and Interests Under the Plan**

       The Plan divides the Claims of Creditors, other than Administrative Claims and Priority Tax Claims, and Interests into various classes. Listed below is a summary of the Classes of Claims and Interests under the Plan, including voting rights pursuant thereto. Only classes of Creditors and Interests with Claims or Interests impaired under the Plan are entitled to vote on the Plan. Generally, and subject to the specific provisions of the Bankruptcy Code, this includes creditors and equity holders whose claims or interests, under a plan, may be modified in terms of principal, interest, length of time for payment, or a combination of the above. Each holder of a Claim in a Class that is not impaired under the Plan is conclusively presumed to have accepted the Plan, and solicitation of the acceptances from the holders of such Claims is not required and will not be undertaken.

       **(i)**       **Summary of Classified Claims and Interests** ~~of Elcom Hotel~~

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Claim of OBH Funding, LLC | Unimpaired | No (deemed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| ~~2~~3 | Priority Unsecured Non-Tax Claims | Unimpaired | No (deemed to accept) |
| ~~3~~4 | General Unsecured Vendor Claims | Impaired | Yes |
| ~~4~~5 | General Unsecured Claims | Impaired | Yes |
| ~~5~~6 | Equity | Impaired | No (deemed to reject) |

       **~~(ii)~~**       **~~Summary of Classified Claims and Interests of Elcom Condo~~**

| ~~Class~~ | ~~Claim~~ | ~~Status~~ | ~~Voting Rights~~ |
|---|---|---|---|
| ~~1~~ | ~~Secured Claims~~ | ~~Unimpaired~~ | ~~No (deemed to accept)~~ |
| ~~2~~ | ~~Priority Unsecured Non-Tax Claims~~ | ~~Unimpaired~~ | ~~No (deemed to accept)~~ |
| ~~3~~ | ~~General Unsecured Claims~~ | ~~Impaired~~ | ~~Yes~~ |
| ~~4~~ | ~~Equity~~ | ~~Impaired~~ | ~~No (deemed to reject)~~ |

(iii)(ii)    ~~Elcom Hotel~~ Unclassified Claims

| Claim | Plan Treatment | Range of Estimated Claims | Projected Recovery Under the Plan |
|-------|----------------|---------------------------|-----------------------------------|
| Superpriority Administrative Claims | Paid in full in Cash | $2,200,000.00, plus interest, costs, and attorneys' fees | 100% |
| Administrative Claims | Paid in full in Cash | $3,~~300~~773,000.00 | 100% |
| Priority Tax Claims | Paid in full in Cash | $~~154,595.42~~0.00 | 100% |

(iv)    ~~Elcom Condo Unclassified Claims~~

| ~~Claim~~ | ~~Plan Treatment~~ | ~~Range of Estimated Claims~~ | ~~Projected Recovery Under the Plan~~ |
|-------|----------------|---------------------------|-----------------------------------|
| ~~Superpriority Administrative Claims~~ | ~~Paid in full in Cash~~ | ~~$2,200,000.00, plus interest, costs, and attorneys' fees~~ | ~~100%~~ |
| ~~Administrative Claims~~ | ~~Paid in full in Cash~~ | | ~~100%~~ |
| ~~Priority Tax Claims~~ | ~~Paid in full in Cash~~ | ~~$800.00~~ | ~~100%~~ |

**Formatted:** Font: Not Bold, No underline

**Formatted:** Heading 2, Indent: First line:  0.5"

~~(v)~~(iii)  **Summary of Classification, Treatment, and Projected Recoveries of Classified Claims and Interests**

~~ELCOM HOTEL CLAIMS AND INTERESTS~~

| Class | Claim or Interest | Plan Treatment of Class | Range of Estimated Claims | Projected Recovery Under the Plan |
|---|---|---|---|---|
| 1 | OBH Secured Claim | (1) Paid in full in Cash, or (2) receive other treatment rendering the Secured Claim Unimpaired | $1,832,486.14, plus interest | 100% |
| 2 | Other Secured Claims | (1) Paid in full in Cash, or (2) receive other treatment rendering the Secured Claim Unimpaired | $539,053.76 | 100% |
| ~~2~~3 | Priority Unsecured Non-Tax Claims | Paid in full in Cash | $0.00 | 100% |
| ~~3~~4 | General Unsecured Vendor Claims | Each Allowed General Unsecured Vendor Claim shall receive a 50% Distribution from Net Free Cash | $500,000.00 - $971,032.00 | 50% |
| ~~4~~5 | General Unsecured Claims | Each Allowed General Unsecured Claim shall receive a pro rata Distribution of Net Free Cash (after payment of Class ~~3~~4 Claims) and proceeds from the Causes of Action and remaining Assets ~~attributable to Elcom Hotel~~ | $14,000,000.00 - $79,196,255.89 | 0% to 18% |
| ~~5~~6 | Equity | Deemed canceled; however, will receive payment of any Net Free Cash after payment in full of all Allowed Claims | | 0% |

**Formatted Table**

**Formatted Table**

**ELCOM CONDO CLAIMS AND INTERESTS**

| Class | Claim or Interest | Plan Treatment of Class | Range of Estimated Claims | Projected Recovery Under the Plan |
|---|---|---|---|---|
| 1 | Secured Claims[+] | (1) Paid in full in Cash, or (2) receive other treatment rendering the Secured Claim Unimpaired | $604,000.00 | 100% |
| 2 | Priority Unsecured Non-Tax Claims | Paid in full in Cash | $0.00 | 100% |
| 3 | General Unsecured Claims | Each Allowed General Unsecured Claim shall receive a Pro Rata Distribution of Net Free Cash | $14,000,000.00 - $53,531,558.71 | |
| 4 | Equity | Deemed canceled; however, will receive payment of any Net Free Cash after payment in full of all Allowed Claims | | 0% |

Formatted: Font: Bold, Underline

Formatted: Heading 3, No widow/orphan control

The description of the Claims and estimation of recoveries set forth above does not constitute an admission that the claims are Allowed Claims. The Plan recovery is a projection and the Debtors reserve all of their rights, claims, and defenses with respect to any and all Claims. The Plan provides for the procedural substantive consolidation of the Debtors' bankruptcy estates solely for voting, confirmation and distribution purposes; consequently, there will not be any allocation of the Professional Fee Claims between the Elcom Hotel and Elcom Condo estate; rather, they will be joint and several obligations of the Debtors to be paid on the Effective Date or as otherwise provided in the Plan.

The Associations have filed proofs of claim against Elcom Hotel totaling approximately $37,624,115.90, and the Hotel Association filed a proof of claim against Elcom Condo totaling approximately $27,624,115.90. However, based on the Debtors' preliminary review of these claims, the Debtors believe that the Associations' claims are grossly overstated. As such, the Debtors filed an objection to the claims of the Hotel Association [ECF No. 299], and Elcom Hotel anticipates filing an objection to the proof of claim of the Residential Association. [ECF No. 382]. Additionally, numerous owners of units on the Hotel Condominium Lot filed proofs

---

[+] The secured claims asserted against Elcom Condo consist of claims of lien filed by Elcom Hotel and the Hotel Association against the nine Hotel Units owned by Elcom Condo.

of claim in the aggregate amount of $26,852,548.82 against Elcom Hotel and $25,906,642.81 against Elcom Condo. The Debtors believe that certain of these claims are duplicative of the Hotel Association's claims and grossly overstated, and the Debtors anticipate filing objections to these proofs of claim.

The Other Secured Claims included within Class 2 consist of the Hotel Association's secured claim against Elcom Condo for unpaid assessments, which the Debtors estimate in the amount of $206,569.25; and the secured claims of Miami-Dade County for 2012 and 2013 tangible property taxes, and 2013 real estate taxes, owed by Elcom Hotel and Elcom Condo, in the aggregate amount of $332,484.50.

There are several variables that may affect the distributions to the Class 5 General Unsecured Claims. These include, primarily, the consideration ultimately realized by the Debtors through the Sale of their assets, the proceeds realized from liquidation of the Trust Assets (including the Causes of Action), the amounts required to be funded to certain reserves from the Sale proceeds, the amounts that may be realized from the Causes of Action, and perhaps most significantly, the ultimate amount of the allowed General Unsecured Claims after resolution of objections. The Debtors estimate that the range of potential recovery for Class 5 General Unsecured Claims under the Plan could be from 0% to 18%.

### H. Transactions Contemplated by the Plan

On or before the Effective Date, the Sale will occur which will result in the sale of the Real Property and associated personal property to the Prevailing Bidder. On the Effective Date, all of the Debtors' remaining assets after payments under the Plan on the Effective Date shall be transferred to and vest in the Trust. The ~~Plan Administrator~~Liquidating Trustee will oversee the activities of the Trust. The ~~Plan Administrator~~Liquidating Trustee shall be responsible for administering the Trust as set forth under the Plan and the Trust Agreement.

### I. Consummation

Following confirmation, the Plan will be consummated on the Effective Date, which is the date that is the first Business Day after the Confirmation Date on which no stay of the Confirmation Order is in effect and all conditions to the occurrence of the Effective Date have been satisfied or waived. Distributions to be made under the Plan will be made on or as soon as reasonably practicable after the Effective Date in accordance with the Plan.

### J. Liquidation Analysis

The Debtors believe that the Plan will produce a recovery for Holders of Allowed Claims against the Estates that will likely be more than in a Chapter 7 liquidation because of, among other things, (1) the depressed value of the Property due to conversion, lack of operational funding, the perception of a "fire sale", and (2) the additional Administrative Claims generated by conversion to Chapter 7 cases.

A liquidation under Chapter 7 requires liquidation of a debtor's assets by a trustee. In a Chapter 7, the amount unsecured creditors receive depends on the net estate available after all

assets of the debtor have been reduced to cash. The cash realized from the liquidation of the debtor's assets would be in accordance with the order of distribution prescribed in the Bankruptcy Code.

If the cases were converted to Chapter 7, a Trustee would be appointed from the panel of Chapter 7 Trustees for the Southern District of Florida. The Trustee would inherit an asset which includes a hotel operation, management of the Shared Facilities, and significant interaction with the members of the Associations. Significantly, the Trustee would not be able to obtain financing from the Debtors' affiliates to sustain post-conversion operations. It is the Debtors' opinion that financing from a third party is either extremely expensive or more likely unavailable. The Trustee would have to retain professionals (accounting and legal) to assist with operational issues, gain familiarity with the complex governing documents for the Property, and immediately put into place a process to sell the Property under circumstances that are both challenging and compressed with respect to timing. Although the Debtors are unable to determine with perfect accuracy the fees and costs which would be incurred by the Trustee's professionals, it is reasonable to assume that the Trustee and his/her professionals would need to devote substantial time and resources in order to liquidate the Debtors' assets and administer this case in a Chapter 7. The Debtors have estimated that a Chapter 7 Trustee's fees and professionals fees would be approximately $500,000.

The Debtors believe that significantly less value would be realized through a Chapter 7 liquidation of their assets than will be realized through the Plan. Among other things, the Debtors do not expect that post-petition financing of ongoing operational expenses would be available in a Chapter 7, and that as a result, prospective buyers would question the viability of the resort, limiting the opportunity to sell the Debtors' assets as a going concern and depressing the value of the Debtors' hard assets. The Liquidation Analysis sets forth in greater detail the estimated liquidation value of $6,765,414 of the Debtors' assets and the basis for those estimates. In addition, in a Chapter 7 liquidation the estates of Elcom Condo and Elcom Hotel would not be substantively consolidated for distribution purposes, and consequently the value of the Elcom Condo assets would not be available for distribution to creditors of Elcom Hotel.

If the Closing of the Sale occurs prior to conversion to Chapter 7, the Associations disagree with the Debtors' assertions, because there would be no remaining operations of the Debtors that would require financing (i.e., a Chapter 7 Trustee would not be operating a business, but rather, pursuing claims and making distributions to creditors. If the property were sold in a Chapter 7 case, the Associations disagree with the Debtors' estimated $6,765,414 in proceeds and believe that more than that amount would be realized in a Chapter 7 sale. The Associations also believe that the claims in the Derivative Action would have a greater value in a Chapter 7 without the Releases provided in the Plan because the Plan proposed to grant releases to certain named defendants in the Derivative Action (defined herein) and if the Plan is confirmed and the proposed releases are granted, it will likely make it impossible to pursue such defendants in the Derivative Action. The Debtors have not attempted to value or estimate the claims in the Derivative Action either with or without the Releases.

If the Debtors' Bankruptcy Cases were converted to Chapter 7, the present Administrative Claims may have a lower priority than priority claims generated by the Chapter 7 case, such as the Chapter 7 trustee's fees or the fees of attorneys, accountants, and other

professionals engaged by the trustee. The Chapter 7 trustee would be entitled to receive compensation allowed under Bankruptcy Code Section 326. The trustee's compensation is based on 25% of the first $5,000 or less; 10% of any amount in excess of $5,000 but not in excess of $50,000; 5% of any amount in excess of $50,000 but not in excess of $1 million; and reasonable compensation not to exceed 3% of any amount in excess of $ 1 million, on all funds disbursed or turned over in the Chapter 7 case to parties in interest.

The Debtors have proposed to fund the Trust with the amount of $100,000. The Debtors believe that amount is sufficient for the Liquidating Trustee to pursue Causes of Action and undertake the other responsibilities required under the Trust Agreement. The Associations believe that $100,000 is an insufficient amount to fund the Trust.

The Debtors, together with their Professionals, have prepared a Liquidation Analysis, a copy of which is attached to this Disclosure Statement as Exhibit "B", to assist holders of Claims in determining whether to vote to accept or reject the Plan. The Liquidation Analysis compares the proceeds to be realized if the Debtors were to be liquidated in a hypothetical case under Chapter 7 of the Bankruptcy Code with the Distributions to holders of Allowed Claims and Interests under the Plan. The analysis is based upon the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to Chapter 7 liquidation as of a certain date. Further, the analysis is subject to the possibility of material change, including changes with respect to economic and business conditions and legal rulings. **Therefore, the actual liquidation value of the Debtors could vary materially from the estimates provided in the Liquidation Analysis.**

### K.    Risk Factors

Prior to voting to accept or reject the Plan, each holder in a voting Class should carefully consider all of the information in this Disclosure Statement, especially the risk factors described in Section VIII of this Disclosure Statement.

### L.    Voting

After carefully reviewing the Plan, this Disclosure Statement and its exhibit(s), each holder of a Claim or Interest, which has been impaired under the Plan, may vote on acceptance or rejection by completing, dating and signing the ballot, which will be mailed to them after the Court approves this Disclosure Statement, and returning it to the Clerk of the Bankruptcy Court at the following address:

**CLERK OF THE COURT**
**CLAUDE PEPPER FEDERAL BUILDING**
**51 S.W. FIRST AVE, ROOM 1517**
**MIAMI, FL 33130**

In order to be counted, ballots must be received by the Bankruptcy Clerk no later than 5:00 p.m. Eastern Time on_____, 2013. Ballots may also be filed electronically with the Bankruptcy Clerk by registered CM/ECF users.

**Formatted:** Indent: First line:  0.5"

PLEASE VOTE EVERY BALLOT YOU RECEIVE.  Completed ballots for holders of all Claims and Interests should be returned and MUST BE RECEIVED BY THE DEADLINE SET FORTH IN THE BANKRUPTCY COURT ORDER DATED_____, 2013, [ECF No. _____]. If you have Claims or Interests in more than one Class under the Plan, you will receive multiple ballots.

IF A BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, CALL:

**KOZYAK TROPIN & THROCKMORTON, P.A.**
Corali Lopez-Castro, Esq.
2525 Ponce de Leon Blvd., 9th Floor
Miami, Florida 33134
Phone: 305-372-1800
Email: clc@kttlaw.com
Counsel for the Debtors

### M.    The Confirmation Hearing

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan to commence on December 9, 2013, at __:__ _.m.  The Confirmation Hearing will be held before the Honorable Robert A. Mark, United States Bankruptcy Judge, Claude Pepper Federal Building, 51 SW First Avenue, Room 1406, Miami, Florida 33130.  At the hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code, including whether it is feasible and whether it is in the best interest of holders of Claims and Interests.  The Bankruptcy Court will also receive and consider a report of plan voting prepared by the Debtors and summarizing the votes for acceptance or rejection of the Plan by the parties entitled to vote.

## II.    HISTORY OF THE DEBTORS

### A.    General Information

Debtors Elcom Hotel and Elcom Condo are Florida limited liability companies.  The sole member of Elcom Hotel and Elcom Condo is Elevation Communities, LLC ("**Elevation**"). Elcom Hotel and Elcom Condo are member-managed limited liability companies.  The members of Elevation are F9 Investments, LLC ("**F9**") and Elbalha, LLC, whose interest is controlled by F9 Properties, LLC f/k/a ANO, LLC ("**ANO**"), as attorney-in-fact.  Thomas D. Sullivan is the manager of F9, ANO, and Elevation.

This case involves the One Bal Harbour Resort & Spa, located on five acres of land at 10295 Collins Avenue, Bal Harbour, Florida.  The building and improvements consist of a luxury hotel, resort, condominium, restaurant, and spa facility.  It includes 185 luxury residential condominium units and 124 hotel condominium units.  The entire One Bal Harbour facility is governed (i) by the Declaration of Covenants, Restrictions and Easements for 10295 Collins

Avenue Tower (the "**Tower Declaration**") recorded in OR Book 25895, Page 4506 of the Public Records of Miami-Dade County, Florida; and (ii) by a Development Agreement (the "**Development Agreement**") with the Village of Bal Harbour recorded in OR Book 21562, Page 3830 of the Public Records of Miami-Dade County, Florida.

The Tower Declaration divides the project into five vertically subdivided lots:

a.        The "Residential Condominium Lot": By virtue of a separately recorded condominium declaration that is subordinate to the Tower Declaration, the Residential Condominium Lot consists of a condominium that includes 185 residential condominium units. The common area of this condominium is managed by the 10295 Collins Avenue, Residential Condominium Association, Inc. (the "**Residential Association**").

b.        The "Hotel Condominium Lot": By virtue of a separately recorded condominium declaration that is subordinate to the Tower Declaration, the Hotel Condominium Lot consists of a condominium that includes 124 hotel condominium units. Owners of these units are required to operate their units as "five-star" hotel rooms. Owners of these units have certain limited occupancy rights. The common area of this condominium is managed by the 10295 Collins Avenue, Hotel Condominium Association (the "**Hotel Association**").

c.        The "Spa Lot" comprises the spa facilities associated with the hotel.

d.        The "Restaurant Lot" comprises the restaurant facilities associated with the hotel.

e.        The  "Hotel Lot" includes the following facilities (the "**Shared Facilities**," which are neither part of the Residential Condominium Lot or the Hotel Condominium Lot, nor "common elements" of those two condominiums):

i.        The "General Shared Facilities," which consist of the physical structure of the building, the roofs of the building, all parking facilities, all exterior grounds including certain beachfront rights, the majority of the mechanical and electrical systems running through the building, a swimming pool accessible to all residents of One Bal Harbour, and a number of cross-easements for use of a "Plaza" area in common with an adjacent building;

ii.        The "Residential Shared Facilities," which consist of the lobby of the Residential Condominium, all elevators serving the Residential Condominium, all exterior windows and doors of each Residential Unit, all balconies adjacent to each Residential Unit, a separate swimming pool accessible only to owners of Residential Units, and certain mechanical and electrical systems serving the Residential Condominium;

iii.        The "Hotel Condominium Shared Facilities," which consist of all elevators serving the Hotel Condominium, all exterior windows and doors of each Hotel Condominium Unit, all balconies adjacent to each Hotel Condominium Unit and certain mechanical and electrical systems serving the Hotel Condominium;

iv.        The "Non-Residential Shared Facilities";

4233.101/~~348575.4~~349713.3                                    12

v.      The "Shared Facilities Restaurant";

vi.     The "Spa Shared Facilities";

vii.    The "Pool Deck Shared Facilities";

viii.   The "Hotel Condominium Spa Shared Facilities"; and

ix.     The "Shared Facilities Garage".

In June 2009, Elcom Hotel purchased from WCI Communities, Inc. the real property described as the Hotel Lot, Spa Lot, and Restaurant Lot of 10295 COLLINS AVENUE HOTEL CONDOMINIUM, together with an undivided interest in the common elements, according to the Declaration of Condominium thereof recorded in Official Records Book 26093, Page 3225, as amended from time to time, of the Public Records of Miami-Dade County, Florida (the "**Land**").

In June 2009, Elcom Condo purchased 51 of the hotel condominium units from WCI Communities, Inc. Elcom Condo subsequently sold 42 of its hotel condominium units beginning in February 2011. Elcom Condo currently owns the real property hotel condominium units described as Condominium Units 214, 215, 315, 415, 515, 615, 715, 1811, and 1812, of 10295 COLLINS AVENUE HOTEL CONDOMINIUM, together with an undivided interest in the common elements, according to the Declaration of Condominium thereof recorded in Official Records Book 26093, Page 3225, as amended from time to time, of the Public Records of Miami-Dade County, Florida (the "**Hotel Units**"). The Land and Hotel Units shall be collectively referred to as the "**Real Property**." The Debtors purchased the Real Property for approximately $14,600,000.00[2]. ANO provided the Debtors, Elevation, and BALMG, LLC with a $17,450,000.00 loan for the purchase of the Real Property and operating capital. In addition to the Debtors owning the Real Property, Elcom Hotel owns and manages the Shared Facilities.

**B.      Events Precipitating the Bankruptcy Cases**

The Bankruptcy Cases were filed primarily to: (1) displace the Receiver (defined below) and return control of the Hotel Lot, Restaurant Lot, Spa Lot, and Shared Facilities to Elcom Hotel; (2) resolve the Residential Association Litigation (defined below), Hotel Association Litigation (defined below), and other pending litigation in one forum; and (3) assuming the market was receptive, sell the Real Property and associated personal property.

**(i)      Pre-Petition Litigation with the Associations**

Prior to the Petition Date, there was extensive litigation between Elcom Hotel and Elcom Condo and the Residential Association and the Hotel Association. Other parties affiliated with the Debtors were also involved in the litigation.

a.      Residential Association Litigation

---

[2] This purchase price included all 51 hotel condominium units.

**Formatted:** Font: 12 pt

On March 1, 2010, the Residential Association filed suit against Elcom Hotel in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, (the "**State Court**). Case No. 10-13859-CA-11 (the "**Residential Association Litigation**").  An amended complaint filed by the Residential Association on November 28, 2011, is the operative pleading in the Residential Association Litigation.  The Residential Association Litigation consisted of eight counts: Count I (Violations of Florida Statutes, Chapter 718 (the "**Florida Condominium Act**")) against Elcom Hotel; Count II (Breach of Fiduciary Duty) against Jorge Arevalo, Juan Arevalo, Elcom Hotel, One Hotels, LLC, and One Luxury Management, LLC; Count III (Breach of Contract) against Elcom Hotel; Count IV (Breach of Covenants Running with Real Property) against Elcom Hotel; and Count V (Accounting of Funds) against Elcom, One Hotels, LLC, One Luxury Management, LLC, Jorge Arevalo, and Juan Arevalo; Count VI (Civil Theft) against Elcom Hotel, One Hotels, One Luxury Management, LLC, JYM Ltd., JYM General Partner, LLC, Jorge Arevalo, and Juan C. Arevalo; Count VII (Civil Remedies for Criminal Practices) against Elcom Hotel, Elcom Condo, One Hotels, LLC, One Luxury Management, LLC, JYM General Partner, LLC, Jorge Arevalo, and Juan Arevalo); and Count VIII (Violations of Florida's RICO Statute – Fla. Stat., Ch. 895) against Elcom Hotel, Elcom Condo, One Hotels, LLC, One Luxury Management, LLC, JYM General Partner, LLC, ANO, LLC, Jorge Arevalo, and Juan C. Arevalo).  Elcom Hotel, Elcom Condo, and ANO, as well as the other defendants, denied the allegations in the Residential Association Litigation.  Counts I and V were dismissed with prejudice by order dated December 29, 2011, because those claims were based on the Florida Condominium Act, which the Court held was inapplicable.  On March 28, 2012, the claim against ANO was dismissed pursuant to a stipulation dropping ANO as a party defendant.

        b.      Hotel Association Litigation

On November 4, 2010, the Hotel Association filed suit against Elcom Hotel and Elcom Condo and eleven other parties in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Case No. 10-58876-CA-32 (the "**Hotel Association Litigation**").  A third amended complaint filed by the Hotel Association on November 15, 2012, is the operative pleading in the Hotel Association Litigation.  The Hotel Association Litigation consists of five counts: Count I (Breach of Fiduciary Duty) against Elcom Hotel; Count II (Breach of Contract) against Elcom Hotel; Count III (Conversion) against Elcom Hotel; Count IV (Civil Remedies for Criminal Practices) against Elcom Hotel, Elcom Condo, and other parties; and Count V (Fraudulent Transfer) against ANO.  Elcom Hotel, Elcom Condo, and ANO, as well as the other defendants, denied the allegations in the Hotel Association Litigation.  Count IV was dismissed by order dated January 5, 2012, because the claim was based on the Florida Condominium Act, which the Court held was inapplicable.

        c.      RMP Litigation

On November 19, 2010, Elcom Hotel filed suit against the Hotel Association in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Case No. 10-60460-CA-01 (the "**RMP Litigation**") (collectively, the Residential Association Litigation, the Hotel Association Litigation, and the RMP Litigation shall be referred to as the "**State Court Litigation**").  In the RMP Litigation, Elcom Hotel sought to stay arbitration proceedings commenced by the Hotel Association.  The Hotel Association and individual hotel condominium

unit owners have asserted counterclaims relating to Elcom Hotel's operation of the rental management program.

d.    Appointment of Receiver

The State Court Litigation was not consolidated. In connection withPursuant to separate motions filed by the Associations in the State Court Litigation, the State Court entered, on or about September 30, 2011, the State Court substantially the same *Order Appointing Receiver* (collectively, the "**Receivership Order**") in each of the proceedings comprising the State Court Litigation. The Receivership Order appointed Jorge J. Perez (the "**Receiver**") as receiver of the Hotel Lot, which includes the Shared Facilities, Restaurant Lot,to, among other things, take control and Spa Lot. In its order appointing the Receivermanage the day-to-day affairs and operations of the "Property," as defined in the Receivership Order. In the Receivership Order, the State Court found that "[t]he appointment of a receiver [was] necessary to preserve and protect the integrity and operations of the Property," and that there was evidence "of fraudulent, deliberate, self-dealing by certain principals of the Defendants for the purpose of misappropriating funds." During the prepetition period where the Receiver was in place, the Hotel Lot was maintained and operated on Elcom Hotel's behalf by BMC – The Benchmark Management Company ("**Benchmark**"), as the Receiver's agent.

The Debtors believed that the State Court Litigation and the receivership were deteriorating the value of the Debtors and putting a strain on the Debtors' business operations. Moreover, the Debtors were not in control of their businesses. Some of the driving forces for the filing of the bankruptcy petitions were to have the State Court Litigation resolved in one forum, terminate the receivership, which was depleting the Debtors' resources and further eroding the Debtors' relationships with the Associations, return exclusive control of operations to the Debtors, stabilize the Debtors' business operations, and prepare the Debtors' Real Property for sale through a plan, assuming the market was receptive.

e.    Foreresic Accounting Report

On December 6, 2011, the Receiver filed a motion in the State Court Litigation to employ Berkowitz Dizk Pollack & Brant (the "**Forensic Accountants**") tto perform forensic accounting and other general accounting tasks. On or about July 26, 2012, the Forensic Accountants issued an extensive 41-page report (with additional exhibits) (the "**Forensic Accounting Report**"). A copy off the Forensic Accounting Report is attached as an exhibit to the  motion filed by the Residential Association to appoint a chapter 11  trustee in the Chapter 11 Cases. See 10295 Collins Avenue, Residential Condominium Association, Inc.'s Emergency Motion to Appoint a Chapter 11 Trustee [ECF No. 29], Exhibits A-1 to A-5.

(ii)    **Other Pre-Petition Litigation**

Prior to the Petition Date, the Debtors were also subject to numerous lawsuits, which were primarily suits by vendors. The lawsuits were primarily pending in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida. A chart of all of the pending lawsuits, which includes a description of the lawsuits, is attached hereto as Exhibit "C".

### III.    THE CHAPTER 11 CASES

The following is a general summary of some of the key matters and occurrences in connection with the Debtors' Bankruptcy Cases.

### A.    General Information

On January 2, 2013, the Debtors commenced these bankruptcy cases by filing voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Florida, Miami Division.  By orders of the Bankruptcy Court dated January 3, 2013, the Debtors' bankruptcy cases are being jointly administered.  The Debtors continue to operate as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

### (i)    The Stipulation

On January 17, 2013, the Debtors, Elevation, ANO, F9, Thomas Sullivan, and the Associations filed a stipulation with the Bankruptcy Court (the "**Stipulation**") [ECF No. 69]. The Stipulation sought to resolve various matters that were pending before the Bankruptcy Court at the time of the filing of the Stipulation.  The Stipulation also addressed certain operational and bankruptcy process issues.  For the full and complete terms of the Stipulation, the Debtors refer all parties to the Stipulation.  The Associations filed, under seal, a Motion to Enforce Stipulation Regarding Sale of Hotel Lot (the "**Motion to Enforce**").  The Debtors filed, under seal, a response objecting to the relief sought in the Motion to Enforce.  The Motion to Enforce was heard by the Bankruptcy Court on October 4, 2013.  The Court granted in part and denied in part the Motion to Enforce [ECF No. 338].  The Court denied the Motion to Enforce to the extent that it sought cancellation of the Debtors' letter of intent with a proposed stalking horse bidder and sought an order requiring the Debtors to solicit alternative stalking horse bidders for the purchase of the Real Property.  However, the Motion to Enforce granted the Associations' request that they be authorized to meet with the proposed stalking horse bidder and its counsel prior to the finalization of a purchase agreement and proposed auction procedures.

### (ii)    Management of the Debtors' Operations

Pursuant to the Stipulation, the Debtors agreed to withdraw their application to retain Alvarez & Marsal and Chuck Bedsole as their chief restructuring officer, in favor of the Associations' choice of Algon Capital, LLC d/b/a Algon Group ("**Algon**") and Troy Taylor.  On February 6, 2013, the Court entered a final order [ECF No. 94] authorizing the Debtors' retention of Algon and Mr. Taylor as their chief restructuring officer ("**CRO**"), as of January 14, 2013. The CRO has remained in place during the pendency of these bankruptcy cases.  The Receiver was displaced as of January 14, 2013.  On March 6, 2013, Elcom Hotel filed a motion for entry of an order authorizing the employment of Benchmark *nunc pro tunc* to January 23, 2013 [ECF No. 116] to continue with, *inter alia*, the management of the day-to-day operations of the Hotel and the Shared Facilities.  The Court entered an order authorizing Benchmark's employment on March 28, 2013 [ECF No. 139].

### (iii)    Mediation of Receiver's Administrative Claim

On April 2, 2013, the Receiver filed a motion for allowance of an administrative claim on his behalf and McDonald Hopkins, LLC, his law firm, in the amount of $2,844,385.71 (the "**Receiver Claim Motion**") [ECF No. 150] for alleged pre- and post-petition amounts due and owing related to his work as Receiver. The Associations and the Debtors have expressed their intention to object to the Receiver Claim Motion. On June 3, 2013, the Bankruptcy Court referred the Receiver Claim Motion to mediation [ECF No. 227]. On July 17, 2013 and September 27, 2013, the Debtors, the Associations, and the Receiver attended mediation. Francis L. Carter served as the mediator. The parties have reached an agreement in principle to resolve the Receiver Claim Motion and will be filing a motion for approval with the Bankruptcy Court. If the Receiver Claim Motion is not consensually resolved, the Bankruptcy Court will proceed with a pre-trial conference scheduled for December 5, 2013.

### (iv)    Plan Mediation

On July 31, 2013, the Bankruptcy Court entered an Order Compelling Court-Ordered Plan Mediation (the "**Plan Mediation Order**") [ECF No. 263]. Pursuant to the Plan Mediation Order, the Debtors and the Associations were required to participate in mediation with respect to plan-related issues. Plan mediation occurred before The Honorable John K. Olson on September 18 and 19, 2013. The plan mediation resulted in an impasse. The Debtors believe that the Associations did not comply with the Plan Mediation Order and preserve all claims and rights against the Associations for their non-compliance with the Plan Mediation Order. The Associations disagree and contend that it was actually the Debtors and Sullivan that did not comply in good with the Plan Mediation Order.

### (v)    Retention of Debtors' Professionals

Throughout these bankruptcy cases, the Debtors, as a debtors-in-possession, have relied upon the assistance of professionals to assist it with the bankruptcy process, including the filing of the bankruptcy petitions and bankruptcy schedules, following additional accounting requirements incumbent upon a debtor in bankruptcy, filing Post-Petition Operating Reports, negotiating with creditors, developing an exit strategy, negotiating with the Associations, and formulating a plan.

On February 7, 2013, the Debtors, as a debtors-in-possession, obtained approval to hire Charles W. Throckmorton, Esq. and the law firm of Kozyak Tropin & Throckmorton, P.A. ("**KTT**") as their general bankruptcy counsel [ECF No. 92] and Duane Morris, LLP as special litigation, real estate and hospitality law counsel [ECF No. 93].

On March 28, 2013, the Court entered an order approving the Debtors' application to retain Barry E. Mukamal and Marcum, LLP as accountants and financial advisors [ECF No. 137]. Elcom Hotel also obtained approval, on March 13, 2013, to hire The Barthet Firm as special litigation collections counsel [ECF No. 121].

### (vi)    Administrative Claims of Professionals

The Professionals employed by the Debtors are entitled to Administrative Claims for services performed (the "**Professional Fee Claims**"). The Debtors operate seasonal businesses and in order to conserve cash on hand and to avoid seeking additional debtor in possession

financing, these claims will be paid through the Plan. These Administrative Claims are entitled to priority over General Unsecured Vendor Claims and General Unsecured Claims. The Debtors estimate the following Administrative Claims asserted by Professionals:

| | |
|---|---|
| KTT | KTT filed an interim fee application in this Bankruptcy Case on September 12, 2013 [ECF No. 292] seeking fees in the amount of $531,097.00 and costs in the amount of $24,083.84 through July 31, 2013. The interim fee application is set for hearing on November 7, 2013. KTT estimates that its total fees upon the Confirmation Date will be approximately $1,000,000.00, with total costs of approximately $36,000.00.[3] |
| Algon Capital, LLC d/b/a Algon Group[4] | Algon has been paid as an ordinary course professional during these Bankruptcy Cases in the amount of $1,064,999.87, and estimates that its total outstanding fees upon the Confirmation Date will be approximately $500,000.00, with total costs of approximately $32,000.00. |
| Marcum, LLP | Marcum, LLP filed an interim fee application in these Bankruptcy Cases on September 12, 2013 [ECF No. 294] seeking fees in the amount of $116,389.00 and costs in the amount of $219.60 through July 31, 2013. The interim fee application is set for hearing on November 7, 2013. Marcum, LLP estimates that its total fees upon the Confirmation Date will be approximately $250,000.00, with total costs of approximately $35,000.00. |
| Duane Morris, LLP | Duane Morris, LLP filed an interim fee application in these Bankruptcy Cases on October 9, 2013 [ECF No. 345] seeking fees in the amount of $60,833.50 and costs in the amount of $52.10 through September 30, 2013. The interim fee application is set for hearing on November 7, 2013. Duane Morris, LLP estimates that its total additional fees upon the Confirmation Date will be approximately $27,500.00, with total costs of approximately $50.00. |

---

[3] KTT is holding a prepetition retainer in its trust account in the amount of $116,177.88.

[4] Although Algon has been paid during these Chapter 11 Cases as an ordinary course professional, Algon agreed to accrue any amounts above $125,000.00 per month after its retention was approved.

4233.101/348575.4349713.3                    18

| | |
|---|---|
| The Barthet Firm | The Barthet Firm filed an interim fee application in these Bankruptcy Cases on September 12, 2013 [ECF No. 293] seeking fees in the amount of $36,539.00 and costs in the amount of $1,547.00 through August 31, 2013. The interim fee application is set for hearing on November 7, 2013. The Barthet Firm estimates that its total additional fees upon the Confirmation Date will be approximately $20,250.00, with total additional costs of approximately $1,500.00. |

In aggregate, the foregoing Professional Fee Claims entitled to payment from the Estates upon confirmation of the Plan as Administrative Claims are estimated to be $2,006,000.00.

In addition to the above-mentioned Professional Fee Claims, the following claims that were associated with the prepetition receivership will also be paid as Administrative Claims:

| | |
|---|---|
| Jorge Perez, as receiver only and not in his individual capacity, and McDonald Hopkins LLC | The amount of Mr. Perez's Allowed Administrative Claim, subject to approval by the Bankruptcy Court, will be $1,200,000.00. |
| Berkowitz Pollack Brant | Berkowitz Pollack Brant has an Allowed Administrative Claim for prepetition services related to work on behalf of the Receiver in the amount of $330,523.57 [ECF No. 193]. |
| The Barthet Firm | The Barthet Firm has an Allowed Administrative Claim for prepetition services related to work on behalf of the Receiver in the amount of $43,662.57 [ECF No. 229]. |
| BMC – The Benchmark Management Company | Benchmark has an allowed administrative claim for prepetition services related to work on behalf of the Receiver in the amount of $193,235.45 [ECF No. 194]. |

In aggregate, the foregoing professional fees and costs entitled to payment from the Estates upon confirmation of the Plan as Administrative Claims are estimated to be $1,767,421.59.

**(vii)    Administrative Claims for Debtor-In-Possession Financing**

Since the Petition Date, the Debtors sought and were approved for debtor-in-possession financing on two occasions.  *See* ECF Nos. 202, 311.  The Debtors were approved for $2,200,000.00 in debtor-in-possession financing.  *See* ECF Nos. 230, 350.  The debtor-in-possession financing was provided by OBH Funding, LLC.  OBH Funding, LLC is also entitled to interest and attorneys' fees and costs related to the debtor-in-possession financing.  These claims are entitled to payment as superpriority Administrative Claims pursuant to 11 U.S.C. § 364(c).  The superpriority Administrative Claims receive priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, including, but not limited to, the Administrative Claims.

**(viii)    Extension of Exclusivity Period to File Plan**

In accordance with Section 1121 of the Bankruptcy Code, the Debtors were given the exclusive right to file a plan for 120 days following the Petition Date and 60 additional days to solicit acceptances of that plan by the Classes (the "**Exclusivity Period**").  The original Exclusivity Period was set to expire on May 2, 2013; however, the Court granted the Debtors' request for a 60-day extension of the Exclusivity Period until July 31, 2013 [ECF No. 195].  The Debtors filed a second motion requesting an additional 60-day extension of the Exclusivity Period until September 30, 2013, which was approved by order of the Court dated August 1, 2013 [ECF No. 263].  The Exclusivity Period was further extended by order of the Court, through and including October 17, 2013 [ECF No. 323].

**(ix)    Residential Association Injunction Complaint**

On July 2, 2013, the Residential Association initiated an adversary proceeding by filing a Complaint for Injunctive Relief against the Debtors, Adv. Case No. 13-01494-RAM (the "**Injunction Action**").  In the Injunction Action, the Residential Association sought to prevent the Debtors from distribution what was termed in the Injunction Action as the "One Bal Harbour Sales Book."  On September 3, 2013, the Debtors filed a motion to dismiss the Injunction Action [ECF No. 6 in the Injunction Action].  The Debtors' motion to dismiss the Injunction Action was scheduled to be heard by the Bankruptcy Court on October 4, 2013.  The Residential Association filed a voluntary motion to dismiss the Injunction Action [ECF No. 10], which was granted by the Court [ECF No. 12 in the Injunction Action].  The Court retained jurisdiction to consider a request by the Debtors for attorneys' fees and costs for defending the Injunction Action.  The Debtors' motion to dismiss was denied as moot [ECF No. 13 in the Injunction Action].

**(x)    Associations' Derivative Standing Complaint**

On August 8, 2013, the Associations initiated an adversary proceeding by filing a Complaint against Elevation Communities, LLC, One Hotels LLC, One Luxury Management, LLC, WE Valet, LLC, JYM, Ltd., JYM General Partner LLC, ANO, LLC, Jorge Arevalo, Juan Camilo Arevalo, and Thomas Sullivan, Adv. Case No. 13-01590-RAM (the "**Derivative Action**").  The Associations asserted 17 counts in the Derivative Action.  The Associations believed that they had derivative standing on behalf of the Debtors, pursuant to the Stipulation, to commence the Derivative Action.  The counts in the Derivative Action are as follows: Count I – Negligence – Accounting and Financial Mismanagement; Count II – Gross

Negligence/Reckless Disregard/Bad Faith/Willful and Wanton Misconduct – Accounting and Financial Mismanagement; Count III – Breach of Fiduciary Duty; Count IV – Aiding and Abetting Breach of Fiduciary Duty; Count V – Waste of Corporate Assets/Ultra Vires Acts; Count VI – Unjust Enrichment; Count VII – Action to Avoid Fraudulent Transfers Pursuant to Section 544 of Bankruptcy Code and Section 726.105(1)(a) of Florida Statutes; Count VIII – Action to Avoid Fraudulent Transfers Pursuant to Section 544 of Bankruptcy Code and Section 726.105(1)(b) of Florida Statutes; Count IX - Action to Avoid Fraudulent Transfers Pursuant to Section 544 of Bankruptcy Code and Section 726.106(1) of Florida Statutes; Count X – Recovery of Property Pursuant to Section 550 of Bankruptcy Code; Count XI – Accounting of Funds; Count XII – Civil Theft; Count XIII – Conversion; Count XIV – Civil Remedies for Criminal Practices; Count XV – Violations of Florida's RICO Statute – Florida Statutes, Chapter 895; Count XVI – Equitable Subordination; and Count XVII – Recharacterization.

On October 7, 2013, the Associations filed an amended complaint [ECF No. 27 in the Derivative Action], which contained four additional counts, foreclosure of liens against Elcom Condo, foreclosure of liens against Elcom Hotel, recovery of property pursuant to section 548 of the Bankruptcy Code, and piercing the corporate veil of the Debtors.  The Debtors believe that the new claims brought against the Debtors are illogical and violate the automatic stay.  The Debtors have requested withdrawal of the claims and if the Associations refuse to do so, the Debtors shall seek fees and costs against the Associations.

Generally, the Derivative Action alleges that the defendants, including Jorge Arevalo (a former co-manager of Elevation, the manager of the Debtors), and entities that he controlled, mismanaged the Debtors, including failing to account for moneys received for Shared Facilities Expenses, inflating the Shared Facilities Expenses budget, engaging in self-dealing and deliberate manipulations of the Shared Facilities Expenses, Shared Facilities Reserves, and the Associations' reserves, improperly imposing special assessments, misrepresenting insurance costs, and failing to keep appropriate records. The Derivative Action alleges that Thomas Sullivan, as a co-manager and/or member of Elevation, had "actual or imputed knowledge" of Arevalo's misconduct, and that entities owned and/or controlled by Sullivan received payments from the Debtors on loans that the Associations seek to recharacterize as equity contributions.

In the Derivative Action, the Associations have, among other things, included a count against Sullivan seeking to subordinate certain claims, and a count for recharacterization against Sullivan and ANO, LLC seeking to recharacterize ANO's loan to the Debtors as equity capital. If the Associations are successful on those counts, the Associations believe that the holders of Allowed Claims in Class 5 would receive higher Distributions if there are sufficient funds to make a distribution to Class 5.

ANO, LLC, Elevation, and Thomas Sullivan have filed a Motion to Dismiss all claims in the Derivative Action against them [ECF No. 36 in the Derivative Action], asserting that the Associations and their counsel have repeatedly acknowledged that they have no evidence that Sullivan participated in the Arevalos' wrongdoing, and that the Associations have not asserted any viable claims against ANO, LLC, Elevation or Mr. Sullivan.

On September 30, 2013, Jorge Arevalo, We Valet, LLC, JYM, Ltd., and JYM General Partner, LLC filed a Motion for Permissive Abstention [ECF No. 18 in the Derivative Action]. TheOn October 25, 2013, the Court entered an Order denying the Motion for Permissive

Abstention, but abating the Derivative Action until the Liquidating Trustee takes over responsibility for its litigation, if the Plan is scheduled to be heard on October 22, 2013confirmed.

In connection with the Derivative Action, the Associations filed a Motion for Order Declaring Debtors Have No Attorney Client Privilege Under the Crime/Fraud Exception (the "**Crime/Fraud Motion**") [ECF No. 286]. The Debtors believe that the Crime/Fraud Motion has absolutely no merit and filed a response to the Crime/Fraud Motion on October 1, 2013 [ECF No. 331]. The Crime/Fraud Motion was scheduled to be heard by the Bankruptcy Court on October 22, 2013; however, on October 7, 2013, the Associations withdrew the Crime/Fraud Motion [ECF No. 339].

**Formatted:** Font: Not Bold, No underline

To the best of the Debtors' knowledge, Jorge Arevalo does not directly or indirectly have any ownership interest in any entity holding any Claim that is or may become an Allowed Claim under the Plan, including but not limited to an Administrative Claim, and therefore, the Debtors do not expect that Jorge Arevalo will receive any Distributions under the Plan. Moreover, the Debtors anticipate that there will be no Distributions under the Plan on account of any equity Interests in the Debtors , and any such Distribution(s) to holders of equity Interests would only occur after all holders of Allowed Claims have received Distributions under the Plan representing the full amount of their Allowed Claims.

**(xi)    Post-Petition Litigation**

A summary of the Debtors Post-Petition Date litigation is attached hereto as Exhibit "D".

**(xii)    Sale Motion**

Shortly after the filing of this Disclosure Statement, the Debtors intend to fileThe Debtors on October 21, 2013 filed a Motion for Entry of Order (I) Approving Competitive Bidding Procedures, (II) Approving Form and Manner of Notices, (III) Approving Form of Purchase and Sale Agreement, (IV) Scheduling Dates to Conduct Auction and Hearing to Consider Final Approval of Sale, Including Treatment of Executory Contracts and Unexpired Leases, (V) Authorizing Sale of Substantially All of Debtors' Assets Pursuant to 11 U.S.C. § 363, Free and Clear of All Liens, Claims, Encumbrances and Interests, and (VI) Granting Related Relief (the "**Auction Procedures Motion**") [ECF No. ——].375]. The Debtors are finalizinghave executed a Purchase and Sale Agreement (the "**Purchase Agreement**") with the proposed stalking horse bidder (the "**Proposed Purchaser**"). The Purchase Agreement with the Potential Purchaser seeks to sell substantially all of the Debtors' Assets. A copy of the Purchase Agreement will beis attached to the Auction Procedures Motion. As noted at the hearing on the Motion to Enforce, theThe Debtors shall seekpropose to have a 363 sale auction (the "**Sale**") of substantially all of their Assets, which would subject the Purchase Agreement with the Potential Purchaser to higher and better offers with the hopes of maximizing value for the Debtors' Estates.

The Bankruptcy Court has indicated that it will conductconducted a hearing on the Auction Procedures Motion on November 4, 2013 [ECF No. 338] if the Auction 338], and on November 7, 2013 entered an Order (A) Approving Competitive Bidding and Sale Procedures Motion is filed.; (B) Approving Form and Manner of Notices; (C) Approving Form of Purchase and Sale Agreement; (D) Scheduling Dates to Conduct Auction and Hearing to Consider Final

Approval of Sale, Including Treatment of Executory Contracts and Unexpired Leases; (E) Authorizing Sale of Substantially All of Debtors' Assets Pursuant to 11 U.S.C. § 363, Free and Clear of All Liens, Claims, Encumbrances and Interests; and (F) Granting Related Relief ("**Auction Procedures Order**") [ECF No. 418]. The ~~Debtors propose having the Sale~~ Auction Procedures Order schedules an Auction on December ~~5, 2012.  The Debtors shall seek to have the hearing to approve the Sale on~~ 4, 2013, and a Sale Hearing for December 9, 2013 ~~[ECF No. 338]~~. The Debtors anticipate funding the Plan with the proceeds from the Sale, which the Debtors anticipate closing on or before December 31, 2013.

The Proposed Purchaser's Purchase Agreement which is the subject of the Auction Procedures Order proposes to sell the Property for $12,250,000, subject to certain adjustments at closing, and subject to higher and better offers in accordance with the procedures set forth therein. The Purchase Agreement contemplates, among other things, that at least 95 of the current Rental Management Agreements between the Debtors and individual unit owners will be assumed and assigned to the Prevailing Bidder at closing, and that the individual unit owners will not have the right to cancel the Rental Management Agreements as a result of a change in ownership or management of the Property. The Associations contend that paragraph 15(c) of the Rental Management Agreements provide individual unit owners the right to terminate the Rental Management Agreements as a result of (i) any termination of the current hotel manager (Benchmark), (ii) the winding up of the receivership estate created under the Receivership Orders, or (iii) the sale or transfer of the Hotel Lot. The Debtors will seek a determination that any such provision is an unenforceable anti-assignment clause.

**IV.    SUMMARY OF DEBTORS' ASSETS AND LIABILITIES**

**A.    The Real Property**

The assets and the liabilities of the Debtors as of the filing of the Voluntary Petitions herein are substantially as set forth in Elcom Hotel's and Elcom Condo's Bankruptcy Schedules A, B, D, E, and F, [ECF Nos. 84 and 87, respectively], copies of which are available for review upon request.  Please direct all such inquires to counsel for the Debtors at the contact information specified in Section I, L above.  More specifically, the Debtors hold title to the Real Property, as more fully described in Section III, A, above.  The Debtors estimate the value of the Real Property to be at least $13,000,000.00; however, the value will be determined at the Sale.  OBH Funding, LLC holds the only valid lien on the Land totaling approximately $1,832,486.14, plus interest and attorneys' fees.  OBH Funding, LLC's lien is the result of a Receiver's Certificate issued and approved in the State Court Litigation.

**B.    The Personal Property**

Elcom Hotel and Elcom Condo each possess personal property which is listed on Schedule B of their Bankruptcy Schedules [ECF Nos. 84 and 87, respectively].  The value of Elcom Hotel's personal property is estimated to be unknown, and the value of Elcom Condo's personal property is estimated to be unknown. The Debtors' most recent Post-Petition Operating Report reflects approximately $2.7 million in cash in the Debtors' accounts as of September 30, 2013, which includes operating revenue and collection of fourth quarter 2013 Shared Facilities Assessments from unit owners. The Debtors' accrued cash has and will be used to pay (a) post-petition accounts payable in the ordinary course of business; and (b) fourth quarter 2013 Shared

Facilities expenses. The Debtors do not expect for there to be significant cash available upon the closing of a sale to fund distributions under the Plan other than from the sale proceeds.

### C.    Intellectual Property

Elcom Hotel owns certain rights to the intellectual property in the name of ONE Bal Harbour.  The estimated value of the intellectual property is unknown.

> **Formatted:** Font: Bold, Underline

### D.    Summary of Claims Against Debtors

A summary of the filed Claims for each Debtor is as follows:[5]

### (i)    Claims Against Elcom Hotel

As of the filing of this Disclosure Statement, there was a total of $79,017,798.80 in Claims filed against the Elcom Hotel Estate.  Of those Claims, $1,089,458.87 were filed as secured and $1,200.00 were filed as priority.  Elcom Hotel intends on filing objections to certain of the filed Claims because, *inter alia*, they are inflated, improperly categorized, Elcom Hotel has no record of the alleged debt, or the claim is disputed.

The claims against Elcom Hotel include the Hotel Association's proof of claim for approximately $27,624,115.90 and the Residential Association's proof of claim for approximately $10,000,000. Based on the Debtors' preliminary review, the Debtors believe that the Associations' claims are grossly overstated, and the Debtors have filed objections to the claims [ECF No. 299, 382]. In addition, numerous owners of units on the Hotel Condominium Lots filed proofs of claim in the aggregate amount of $26,852,548.82 against Elcom Hotel, which the Debtors believe are duplicative of the Hotel Association's claims and grossly overstated, and the Debtors anticipate filing objections to these proofs of claim.

The Debtors have scheduled an allowed general unsecured claim of ANO (f/k/a F9) in each of the Debtors' estates in the the amount of not less than $14,319,591.17 representing a prepetition loan for the purchase of the Real Property and operating capital. See Plan,§§ 3.2.4, 3.3.2; Schedules for Elcom Hotel [ECF No. 84-2 at ECF p. 16 of 31] and Elcom Condominium [ECF No. 87 at ECF p. 19 of 31]. The Associations dispute that ANO provided a loan in the amount of $17,450,000 for the purchase of the Real Property and operating capital. Based on statements in the Forensic Accounting Report, the Associations believe that the entire $17,450,000 represented an equity infusion and that the claim should be disallowed. The Debtors disagree with the Associations' assertions.

---

[5] The description of the Claims does not constitute an admission that the claims are Allowed Claims.  The Debtors reserve all of their rights, claims, and defenses with respect to any and all Claims.

(ii)     **Claims Against Elcom Condo**

As of the filing of this Disclosure Statement, there was a total of $53,531,558.71 in Claims filed against the Elcom Condo Estate. Of those Claims, $206,569.26 were filed as secured and $800.00 were filed as priority. Elcom Condo intends on filing objections to certain of the filed Claims because, *inter alia*, they are inflated, improperly categorized, Elcom Condo has no record of the alleged debt, or the claim is disputed, or it is a contingent/unliquidated/disputed Claim against Elcom Hotel, not Elcom Condo.

The claims against Elcom Condo include the Hotel Association's proof of claim for approximately $27,624,115.90, which the Debtors believe is duplicative of the Hotel Association's claim in the Elcom Hotel case and otherwise objectionable, and it is also subject to objection [ECF No. 299].

E.     **Causes of Action**

The Debtors are currently still in the process of investigating potential causes of action. However, potential causes of action owned by the Debtors may include, but are not limited to, Avoidance Actions, primarily preference claims and fraudulent transfers, and potential claims against the Associations for interference with the Debtors' plan process. A preliminary list of potential litigation targets and a brief description of the potential causes of action is attached hereto as Exhibit "E".

The Causes of Action which will be transferred to the Trust pursuant to the Plan include the Derivative Action. The Derivative Action does not quantify the amount of the claims asserted against each of the defendants named in the complaint, and the Debtors have not independently quantified or estimated the expected recovery on these unliquidated tort claims.

V.     **PRESENT CONDITION OF DEBTORS**

Since the Petition Date, the Debtors have been operating their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Code. During the pendency of these bankruptcy cases, the Debtors, with the assistance of the CRO, Benchmark, and Thomas Sullivan, have maintained and stabilized the Debtors' operations and prepared the Real Property for sale, assuming the market is receptive.

Elcom Hotel added twelve units to the hotel rental management program, which now has 102 units participating in the program. The year-to-date room revenues have increased by 13% over 2012, the occupancy is 85% vs. 72% in 2012, and the average daily room rate has increased by 10.3% over 2012.

Additionally, the Debtors' restructured their property and general insurance coverage, which has resulted in substantially increased coverage and an annualized savings of in excess of $400,000.00. This was done by implementing a competitive bidding process for receiving insurance premium/coverage quotes. Elcom Hotel also implemented a cost cutting program in July 2013, which will result in savings of approximately $477,000.00 through December 31, 2013, including, but not limited to, renegotiating the contracts on overnight cleaning,

landscaping, valet, window cleaning, TV and Internet services, and pool maintenance, while maintaining or increasing service levels.

With respect Elcom Hotel's operation of the restaurant located at ONE Bal Harbour, revenues have increased by $140,000.00 year-to-date over the same period in 2012.

Copies of the Debtors' operating reports (ECF Nos. 114, 115, 128, 129, 198, 199, 224, 225, 239, 240, 258, 259, 281, 282, 342, 343) (hereinafter "**Post-Petition Operating Reports**") are available for review upon request. Please direct all such inquires to counsel for the Debtors at the contact information specified in Section I, L above.

## VI.    SUMMARY OF THE PLAN

The following is a summary of the significant provisions of the Plan and is qualified in its entirety by the provisions of the Plan. The Plan is a legally binding document upon confirmation and Creditors may wish to consult with their own attorneys, if any, to understand the Plan more fully. In the event and to the extent that the description of the Plan contained in this Disclosure Statement is inconsistent with any provisions of the Plan, the provisions of the Plan shall control and take precedence. All creditors are urged to carefully read the Plan.

### A.    Unclassified Claims – Administrative and Priority Tax Claims

#### (i)    Administrative Claims

An Administrative Claim is defined in the Plan as a claim constituting a cost or expense of administration of the Debtors' Chapter 11 cases under Section 503(b) of the Bankruptcy Code and that is entitled to priority under Section 507(a) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the estate, and all fees and charges assessed against the bankruptcy estate under Chapter 123 of Title 28, United States Code.

All requests for payment of Administrative Claims, excluding applications for payment of Professional Fee Claims, shall be filed with the Bankruptcy Court and served upon the Debtors at least fourteen days (14) before the Confirmation Hearing or by such earlier deadline as may apply to such Administrative Claim pursuant to order of the Bankruptcy Court. Except as provided herein, any Administrative Claim for which an application or request for payment is not filed within such time period shall be discharged and forever barred.

The Plan provides that, subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, the Debtors or the ~~Plan Administrator~~Liquidating Trustee, as applicable, shall pay each holder of an Allowed Administrative Claim or Professional Fee Claim the full amount of such Allowed Administrative Claim or Professional Fee Claim in Cash (i) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim or Professional Fee Claim is due or as soon as practicable thereafter); (ii) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim or Professional Fee Claim is due); (iii) at such later time as may be agreed upon by such holder and the Debtors or the ~~Plan Administrator~~Liquidating Trustee, as applicable; or (iv) at such time and upon such

анной

terms as set forth in an order of the Bankruptcy Court. ~~All payments of Professional Fee Claims shall be allocated among each of the Debtors based on the nature of the work performed~~ The Plan provides for the procedural substantive consolidation of the Debtors' bankruptcy estates solely for voting, confirmation and distribution purposes; consequently, there will not be any allocation of the Professional Fee Claims between the Elcom Hotel and Elcom Condo estate; rather, they will be joint and several obligations of the Debtors to be paid on the Effective Date or as otherwise provided in the Plan.

### (ii)    Priority Tax Claims

The Plan further provides that the Debtors or the ~~Plan Administrator~~ Liquidating Trustee, as applicable, shall pay each holder of an Allowed Priority Tax Claim the full unpaid amount of such Allowed Priority Tax Claim in Cash, on or as soon as practicable after the latest of: (i) the Effective Date; (ii) the date such Allowed Priority Tax Claim becomes Allowed; and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law. All payments of Allowed Priority Tax Claims shall be allocated to the Debtor's Estate against which such Priority Tax Claim was Allowed.

### (iii)    U. S. Trustee Fees.

Notwithstanding any other provision of this Plan, the Debtors, the Trust, or the ~~Plan Administrator~~ Liquidating Trustee, as appropriate, shall pay within ten days after the Effective Date all fees incurred under 28 U.S.C. § 1930(a)(6) ("**U.S. Trustee Fees**"), attributable to the Debtors for the period ending on the Effective Date. For the period commencing on the Effective Date through the earlier of (a) the closing of the Bankruptcy Cases by the issuance of a final decree by the Bankruptcy Court and (b) entry of an order dismissing or converting the Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code, the ~~Plan Administrator~~ Liquidating Trustee shall (x) file with the Bankruptcy Court the quarterly operating reports regarding the Trust for the post-confirmation period and (y) pay all fees incurred under 28 U.S.C. § 1930(a)(6) based on the Disbursements made pursuant to the Plan.

### B.    Classification and Treatment of Claims and Interests

### (i)    Summary

The Plan constitutes a Chapter 11 plan for each of the Debtors, Elcom Hotel and Elcom Condo. Except for Administrative Claims and Priority Tax Claims, all Claims against and Interests in each of the Debtors are placed in Classes. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims or Priority Tax Claims. ~~In addition, these Chapter 11 Cases have been consolidated~~ The Plan provides for ~~administrative purposes only. No~~ the procedural substantive consolidation of the ~~Debtors has been sought or is otherwise proper. The treatment~~ Debtors' estates solely for ~~each Claim set forth below identifies the particular Estate from which~~ voting, confirmation and distribution purposes, such ~~Claim is to be satisfied. The Assets of each Estate~~ that all of the assets of both Elcom Hotel and Elcom Condo shall be used to ~~satisfy only the Claims of that Estate and shall not be used to satisfy or otherwise reduce~~ pay the Allowed ~~Claims of any other Estate~~ Claims of both the Elcom Hotel and Elcom Condo cases on a consolidated basis, as set forth in greater detail below.

The charts shown below classify Claims against and Interests in each of the Debtors for all purposes, including voting, confirmation and Distribution pursuant to the Plan and sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class, other than for voting purposes, only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date of the Plan.

Section 1122(a) of the Bankruptcy Code provides that a Plan may place a Claim or Interest in a particular Class only if that Claim or Interest is substantially similar to the other Claims or Interests in such Class. Classification is a method of recognizing differences in the rights of Creditors and Interests, which call for a difference in treatment of their respective Claims.

**(ii)    Summary of Classified Claims and Interests ~~of Eleom Hotel~~**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Secured Claim of OBH Funding, LLC | Unimpaired | No (deemed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| ~~2~~3 | Priority Unsecured Non-Tax Claims | Unimpaired | No (deemed to accept) |
| ~~3~~4 | General Unsecured Vendor Claims | Impaired | Yes |
| ~~4~~5 | General Unsecured Claims | Impaired | Yes |
| ~~5~~6 | Equity | Impaired | No (deemed to reject) |

**(iii)    ~~Summary of Classified Claims and Interests of Eleom Condo~~**

| ~~Class~~ | ~~Claim~~ | ~~Status~~ | ~~Voting Rights~~ |
|-------|-------|--------|---------------|
| ~~1~~ | ~~Secured Claims~~ | ~~Unimpaired~~ | ~~No (deemed to accept)~~ |
| ~~2~~ | ~~Priority Unsecured Non-Tax Claims~~ | ~~Unimpaired~~ | ~~No (deemed to accept)~~ |
| ~~3~~ | ~~General Unsecured Claims~~ | ~~Impaired~~ | ~~Yes~~ |
| ~~4~~ | ~~Equity~~ | ~~Impaired~~ | ~~No (deemed to reject)~~ |

> **Formatted:** Heading 3, Indent: Left: 1.5", No widow/orphan control

(iv)(iii) **Classification and Treatment of Claims and Interests** ~~of Elcom Hotel~~

Class 1 – Elcom Hotel Secured Claims

(a)      Classification:  Class 1 consists of ~~all Elcom Hotel~~the Secured ~~Claims~~Claim of OBH Funding, LLC.  OBH Funding, LLC is the only Creditor in Class 1.

(b)      Impairment and Voting:  Class 1 is Unimpaired by the Plan.  Each holder of an Elcom Hotel Secured Claim is presumed to accept and therefore is not entitled to vote to accept or reject the Plan.

(c)      Treatment:   Except to the extent that OBH Funding, LLC agrees to a less favorable treatment under the Plan, in exchange for full and final satisfaction, settlement, release, and discharge, OBH Funding, LLC, at the sole option of Elcom Hotel or the ~~Plan Administrator~~Liquidating Trustee, as applicable: (i) be paid in full in Cash, or (ii) receive other treatment rendering such Secured Claim Unimpaired, in each case on or as soon as practicable after the Effective Date.  OBH Funding, LLC shall be deemed to have an Allowed Secured Claim in the amount of $1,832,486.14, plus interest, with liens attaching to any Proceeds of the Sale of the Real Property ~~(excluding the Hotel Units)~~ in accordance with applicable state law lien priorities and not subject to objection, disallowance, or subordination.

Class 2 –Other Secured Claims

(a)      Classification:  Class 2 consists of all Other Secured Claims against Elcom Hotel or Elcom Condo. Class 2 consists of the Hotel Association's Secured Claim against Elcom Condo for unpaid assessments, and the claims of Miami-Dade County against Elcom Hotel and Elcom Condo for 2012 and 2013 tangible property and 2013 real estate taxes.

(b)      Impairment and Voting:  Class 2 is Unimpaired by the Plan.  Each holder of an Other Secured Claim is presumed to accept and therefore is not entitled to vote to accept or reject the Plan.

(c)      Treatment:  Except to the extent that a holder of an Other Secured Claim agrees to a less favorable treatment under the Plan, in exchange for full and final satisfaction, settlement, release, and discharge, the holder of such a Secured Claim shall, at the sole option of the Debtors or the Liquidating Trustee, as applicable: (i) be paid in full in Cash, or (ii) receive other treatment rendering such Secured Claim Unimpaired, in each case, on or as soon as practicable after the latest of: (i) the Effective Date and (ii) the date such Allowed Secured Claim becomes Allowed.  As a result of the procedural substantive consolidation of the Elcom Hotel and Elcom Condo estates, any secured claims of Elcom Hotel against Elcom Condo in Class 2, or vice versa, shall be deemed extinguished upon the Effective Date of the Plan.

Class 3 – Elcom Hotel Priority Unsecured Non-Tax Claims

(a)      Classification:  Class 23 consists of all Elcom Hotel Priority Unsecured Non-Tax

Claims.

(b)    Impairment and Voting:  Class ~~2~~3 is Unimpaired by the Plan.  Each holder of an Elcom Hotel Priority Unsecured Non-Tax Claim is presumed to accept and therefore is not entitled to vote to accept or reject the Plan.

(c)    Treatment:  On or as soon as practicable after the Effective Date, Elcom Hotel or the ~~Plan Administrator~~Liquidating Trustee, as applicable, shall pay each holder of an Allowed Elcom Hotel Priority Claim, in full and final satisfaction of such Allowed Elcom Hotel Priority Unsecured Non-Tax Claim, Cash equal to the full amount of its Claim, unless the holder otherwise agrees to less favorable treatment, on or as soon as practicable after the latest of: (i) the Effective Date; (ii) the date such Allowed Elcom Hotel Priority Unsecured Non-Tax Claim becomes Allowed; and (iii) the date such Allowed Elcom Hotel Priority Unsecured Non-Tax Claim is payable under applicable non-bankruptcy law.

Class ~~3    Elcom Hotel~~ 4 – General Unsecured Vendor Claims[6]

(a)    Classification:  Class 4 consists of all General Unsecured Vendor Claims, which includes all parties who are general unsecured creditors of Elcom Hotel and who agree to continue to do business with any new operator who acquires the Debtors' assets on the same or better terms as were provided to the Debtors pre-petition for a period of at least six months. The Proposed Purchaser shall provide a list of all vendors eligible to be included in Class 3 by the date of approval of the Disclosure Statement, and vendors who agree to the conditions set forth herein shall so indicate by casting their ballots as Class 4 Claims.

~~(a)~~    Impairment and Voting:  Class 4 is Impaired by the Plan.  ~~Classification:  Class 3 consists of all Elcom Hotel General Unsecured Vendor Claims.~~

(b)    ~~Impairment and Voting:  Class 3 is Impaired by the Plan.~~ Each holder of a Claim that, if Allowed, would constitute an ~~Elcom Hotel~~ General Unsecured Vendor Claim is entitled to vote to accept or reject the Plan.

(c)    Treatment:  In full satisfaction, settlement, release, and compromise of and in exchange for each ~~Elcom Hotel~~ General Unsecured Vendor Claim, each holder of an Allowed ~~Elcom Hotel~~ General Unsecured Vendor Claim shall receive, on or as soon as practicable after the latest of: (i) the Effective Date and (ii) the date such ~~Elcom Hotel~~ General Unsecured Vendor Claim becomes Allowed, a Distribution equal to 50% of the Allowed ~~Elcom Hotel~~ General Unsecured Vendor Claim.; provided, however, that before there is any distribution to Class 6 ("Interests"), all Allowed General Unsecured Vendor Claims must be paid in full.   The Distribution available to holders of Allowed ~~Elcom Hotel~~ General Unsecured Vendor Claims shall be limited by the Net Free Cash and proceeds from the Causes of Action ~~attributable to Elcom Hotel~~.  The treatment of the General Unsecured Vendor Claims is in consideration of the mutual interest of the Debtors, creditors, and the Proposed Purchaser in maintaining stability and

---

[6] ~~Claims in Class 3 will only consist of trade vendor Claims that will continue to do business with the Prevailing Bidder after the Sale and are deemed to be critical to the Prevailing Bidder's operations at the Real Property.~~

continuity in hotel services and other facilities, and represents the Debtors' best business judgment as to the appropriate inducement to obtain such continued services.

Class 4   Elcom Hotel 5 – General Unsecured Claims

(a)    Classification:  Class 45 consists of all Elcom Hotel General Unsecured Claims.

(b)    Impairment and Voting:  Class 4 is Impaired by the Plan.   Impairment and Voting:  Class 5 is Impaired by the Plan.  Each holder of a Claim that, if Allowed, would constitute an Elcom Hotel a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(c)    Treatment:  In full satisfaction, settlement, release, and compromise of and in exchange for each Elcom Hotel General Unsecured Claim, each holder of an Allowed Elcom Hotel General Unsecured Claim shall receive, on or as soon as practicable after the latest of: (i) the Effective Date and (ii) the date such Elcom Hotel General Unsecured Claim becomes Allowed, a pro rata Distribution of Net Free Cash (after payment of Class 34 Claims) and proceeds from the Causes of Action and remaining Assets attributable to Elcom Hotel. For purposes of this section, a "pro rata Distribution" shall be determined on a substantively consolidated basis in accordance with Section 4 of the Plan.

Class 5   Elcom Hotel 6 – Interests

(a)    Classification:  Class 56 consists of all Interests in Elcom Hotel and Elcom Hotel Interests Condo.

(b)    Impairment and Voting:  Class 56 is Impaired by the Plan.  Holders of Interests in Elcom Hotel and Elcom Condo are presumed to reject and therefore are not entitled to vote to accept or reject the Plan.

(c)    Treatment:  If, and only if, Net Free Cash or any other Assets remain in Elcom Hotel are available after satisfaction of all Allowed Claims against Elcom Hotelthe Debtors, then holders of Interests in Elcom Hotel shall receive a Distribution of all remaining Net Free Cash of Elcom Hotel and any other Assets comprising the Elcom Hotel Estate.  If no Net Free Cash or other Assets remain after satisfaction of all Allowed Claims against Elcom Hotel, then, on the earliest date following the Effective Date upon which a determination can be made that no Net Free Cash or other Assets remain in Elcom Hotel, all Interests shall be deemed canceled.

(v)    Classification and Treatment of Claims and Interests of Elcom Condo

Class 1   Elcom Condo Secured Claims

(a)    Classification:  Class 1 consists of all Elcom Condo Secured Claims, including Elcom Hotel and the Hotel Association for unpaid assessments.

(b)    Impairment and Voting:  Class 1 is Unimpaired by the Plan.  Each holder of an Elcom Condo Secured Claim is presumed to accept and therefore is not entitled to vote to accept or reject the Plan.

  
(c)    Treatment:  Except to the extent that Elcom Hotel and/or the Hotel Association agree to a less favorable treatment under the Plan, in exchange for full and final satisfaction, settlement, release, and discharge, Elcom Hotel and/or the Hotel Association, at the sole option of Elcom Condo or the Plan Administrator, as applicable: (i) be paid in full in Cash, or (ii) receive other treatment rendering such Secured Claim Unimpaired, in each case, on or as soon as practicable after the latest of: (i) the Effective Date and (ii) the date such Allowed Elcom Condo Secured Claim becomes Allowed.  Elcom Hotel shall be deemed to have an Allowed Secured Claim, with liens attaching to any Proceeds of the Sale of the Hotel Units in accordance with applicable state law lien priorities and not subject to objection, disallowance, or subordination.

Class 2 - Elcom Condo Priority Unsecured Non-Tax Claims

(a)    Classification:  Class 2 consists of all Elcom Condo Priority Unsecured Non-Tax Claims.

(b)    Impairment and Voting:  Class 2 is Unimpaired by the Plan.  Each holder of an Elcom Condo Priority Unsecured Non-Tax Claim is presumed to accept and therefore is not entitled to vote to accept or reject the Plan.

(c)    Treatment:  On or as soon as practicable after the Effective Date, Elcom Condo or the Plan Administrator, as applicable, shall pay each holder of an Allowed Elcom Condo Priority Unsecured Non-Tax Claim, in full and final satisfaction of such Allowed Elcom Condo Priority Unsecured Non-Tax Claim, Cash equal to the full amount of its Claim, unless the holder otherwise agrees to less favorable treatment, on or as soon as practicable after the latest of: (i) the Effective Date and (ii) the date such Allowed Elcom Condo Priority Unsecured Non-Tax Claim becomes Allowed; and (iii) the date such Allowed Elcom Condo Priority Claim is payable under applicable non-bankruptcy law.

Class 3 - Elcom Condo General Unsecured Claims

(a)    Classification:  Class 3 consists of all Elcom Condo General Unsecured Claims.

(b)    Impairment and Voting:  Class 3 is Impaired by the Plan.  Impaired by the Plan.  Each holder of a Claim that, if Allowed, would constitute an Elcom Condo General Unsecured Claim is entitled to vote to accept or reject the Plan.

(c)    Treatment:  In full satisfaction, settlement, release, and compromise of and in exchange for each Elcom Condo General Unsecured Claim, each holder of an Allowed Elcom Condo General Unsecured Claim shall receive, on or as soon as practicable after the latest of: (i) the Effective Date and (ii) the date such Elcom Condo General Unsecured Claim becomes Allowed, a pro rata Distribution of Net Free Cash and proceeds from the Causes of Action and remaining Assets attributable to Elcom Condo.

Class 4 - Elcom Condo Interests

(a)    Classification:  Class 4 consists of all Elcom Condo Interests.

(b)    Impairment and Voting:  Class 4 is Impaired by the Plan.  Holders of Interests in Elcom Condo are entitled to vote to accept or reject the Plan.

~~(c)    Treatment:  If, and only if, Net Free Cash remains in Elcom Condo after satisfaction of all Allowed Claims against Elcom Condo, holders of Interests in Elcom Condo shall receive a Distribution of all remaining Net Free Cash of Elcom Condo and any other Assets comprising the Elcom Condo Estate.  If no Net Free Cash remains after satisfaction of all Allowed Claims against Elcom Condo then, on the earliest date following the Effective Date upon which a determination can be made that no Net Free Cash or other Assets remain in Elcom Condo, all Interests shall be deemed canceled.~~

**C.**    **Reservation of Rights With Respect to Claims**

The Debtors reserve the right to, among other things: (a) contest the right of the holder of any Claim to vote on the Plan or designate the vote of the holder of any Claim; (b) contest the right of the holder of any Claim to receive Distributions under the Plan, and (c) seek to subordinate any Claim for inequitable conduct or otherwise.

**D.**    **MEANS FOR IMPLEMENTATION OF THE PLAN**

    **(i)**    **The Effective Date**.

Means the business day designated in writing by the Debtors or the ~~Plan Administrator~~Liquidating Trustee on which: (i) no stay of the Confirmation Order is in effect; and (ii) each condition to the occurrence of the Effective Date has been satisfied or waived by the applicable party pursuant to Article ~~—~~8 of the Plan.

    **(ii)**    **Future Operation of Debtors' Businesses**

Although the Debtors are currently operating at this time, after the Effective Date, it is anticipated that the Debtors will have no ongoing business operations.  Accordingly, there is no prospect for income earned from ongoing business operations.  However, it is possible that there may be income from Causes of Action, but this income would be recognized by the Trust.

    **(iii)**    **Execution of the Trust Agreement**.

On or before the Effective Date, the Trust Agreement shall be executed by all necessary parties thereto.  The Trust Agreement is attached to the Plan as Exhibit "A".  The Trust established pursuant to the Trust Agreement is established for the purpose of satisfying Claims by distributing and liquidating the Trust Assets, and such Trust shall have no objective of continuing or engaging in any trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust.  The purpose of the Trust is to provide a mechanism for the liquidation of the Trust Assets and to distribute the proceeds of the liquidation to the holders of Allowed Claims and Interests (the "**Beneficiaries**") net of all claims, expenses, charges, liabilities, and obligations of the Trust, which will be treated as Allowed Claims, in accordance with the terms of the Plan.  No business activities will be conducted by the Trust other than those associated with or related to the liquidation of the Trust Assets.

It is intended that the Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations.  All parties hereto shall treat the transfers in trust described herein as transfers to the Beneficiaries for all

purposes of the Internal Revenue Code (including, §§ 61(12), 483, 1001, 1012, and 1274). All parties hereto shall treat the transfers in trust as if all the transferred assets, including all the Trust Assets, had been first transferred to the Beneficiaries and then transferred by the Beneficiaries to the Trust. The Beneficiaries shall be treated for all purposes of the Internal Revenue Code as the grantors of the Trust and the owners of the Trust. All income of the Trust shall be taxed directly to its Beneficiaries (except to the extent the IRS is a Beneficiary). The ~~Plan Administrator~~Liquidating Trustee shall file returns for the Trust as a grantor trust pursuant to Section 1.671-4(a) or (b) of the Treasury Regulations.

The parties hereto, including the ~~Plan Administrator~~Liquidating Trustee and the Beneficiaries, shall value the Property transferred to the Trust consistently and such valuations shall be used for all federal income tax purposes. The Beneficiaries (except to the extent the IRS is a Beneficiary) shall be responsible for payment of any taxes due with respect to the operations of the Trust. The Trust shall terminate on the date which is the fifth anniversary of its establishment unless sooner terminated, or unless its termination date is extended by the Bankruptcy Court as provided in the Trust Agreement. During its existence, the Trust shall not receive or retain Cash or Cash equivalents in excess of a reasonable amount necessary to meet Claims and contingent liabilities (including Disputed Claims) or to maintain the value of the Trust Assets during liquidation.

The Trust shall distribute to the Beneficiaries all its net income and all the net proceeds from the liquidation of Trust Assets, less such net income or net proceeds reasonably necessary to maintain the value of the Trust Assets or to meet Claims or contingent liabilities (including Disputed Claims). The ~~Plan Administrator~~Liquidating Trustee shall use his/her continuing best efforts to dispose of the Trust Assets, make timely Distributions, and shall not unduly prolong the duration of the Trust.

**(iv)** **Transfer of Property to the Trust**

On the Effective Date, the Debtors shall, on behalf of the Debtors, convey and transfer to the ~~Plan Administrator~~Liquidating Trustee, on behalf of the Trust, all interests in Trust Assets, free and clear of all Encumbrances, by signing and delivering to the ~~Plan Administrator~~Liquidating Trustee such deeds, bills of sale, assignments and other conveyance documents as the ~~Plan Administrator~~Liquidating Trustee requests. The Residential Association disputes that the Derivative Action can and should be transferred to the Trust.

**(v)** **Appointment of ~~Plan Administrator~~Liquidating Trustee**

The Plan provides that a ~~Plan Administrator~~Liquidating Trustee shall be appointed on the Effective Date. The Debtors propose for Michael Goldberg, Esq. to be appointed as the Liquidating Trustee. Mr. Goldberg has no affiliation with the Debtors or any of their affiliates. The duties, powers, and obligations of the ~~Plan Administrator~~Liquidating Trustee shall be set forth in the Trust Agreement. Among other things, the ~~Plan Administrator~~Liquidating Trustee shall be responsible for implementing the Plan, including monetizing or abandoning all of the Trust's assets, pursuing or abandoning all Causes of Action, resolving all Claims, and making Distributions under the Plan. The Liquidating Trustee shall be bonded in favor of the Trust for an amount of 150% of cash on hand, with the expenses of such bond paid by the Trust.

**(vi)** **Fees and Expenses of the Trust**

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees or expenses of the Trust or the ~~Plan Administrator~~Liquidating Trustee, as applicable (including, without limitation, the reasonable fees and expenses of professionals retained by the Trust or the ~~Plan Administrator~~Liquidating Trustee), shall be paid in accordance with the Trust Agreement ~~without further order of the~~subject to Bankruptcy Court~~.~~ approval after notice and hearing. Mr. Goldberg will be compensated for his services as Liquidating Trustee at his usual hourly rate of $650 per hour. The reserve for costs of administering and implementing the Plan and ordinary business expenses of the ~~Plan Administrator~~Liquidating Trustee and the wind down will be $~~50~~100,000.00 for the Debtors, which amount will come from Proceeds of the Sale.

**(vii)** **Periodic Reports to be Filed by Trust**

The ~~Plan Administrator~~Liquidating Trustee shall file periodic reports regarding the administration of Trust's assets, the Distributions made by it, and other matters required to be included in such report in accordance with the Trust Agreement. Quarterly reports shall be filed with the Bankruptcy Court and provided to the United States Trustee in a format acceptable to the United States Trustee.

**(viii)** **Directors/Officers/Managers**

In accordance with the Plan, on the Effective Date, the persons then acting as directors, officers, and/or managers of each of the Debtors shall be released and discharged of all further authority, duties, responsibilities, and obligations relating to and arising from the Debtors or the Chapter 11 Cases.

**(ix)** ~~**Plan Administrator**~~

**(ix)** **Liquidating Trustee**

On the Effective Date, the ~~Plan Administrator~~Liquidating Trustee shall succeed to such powers as would have been applicable to the Debtors' officers, directors, and equity holders, and the Debtors and the Trust shall be authorized to be (and, upon the conclusion of the Wind Down, shall be) dissolved by the ~~Plan Administrator.~~Liquidating Trustee. All property of the Debtors' Estates not distributed to the holders of Claims or Interests on the Effective Date shall be transferred to the Trust and managed and distributed by the ~~Plan Administrator~~Liquidating Trustee pursuant to the terms of the ~~Plan Administrator~~Liquidating Trustee Agreement, and the Plan and shall be held in the name of the Trust free and clear of all Liens, Claims, charges, or other encumbrances against any of the Debtors and the Interests in the Debtors, except for rights to such Distributions provided to holders of Allowed Claims under the Plan.

As provided in the ~~Plan Administrator~~Liquidating Trustee Agreement, the ~~Plan Administrator~~Liquidating Trustee shall have such qualifications and experience to enable it to perform its obligations under the Plan and under the ~~Plan Administrator~~Liquidating Trustee Agreement. Following the Effective Date and in the event of the resignation or removal, liquidation, dissolution, death, or incapacity of the ~~Plan Administrator~~Liquidating Trustee, the ~~Plan Administrator~~Liquidating Trustee shall be succeeded as detailed in the ~~Plan~~

~~Administrator~~<u>Liquidating Trustee</u> Agreement and such successor will become the successor ~~Plan Administrator~~<u>Liquidating Trustee</u> and, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of the predecessor ~~Plan Administrator's~~<u>Liquidating Trustee. The Liquidating Trustee's</u> reasonable costs and expenses shall be compensated and reimbursed by the Trust as set forth in, and in accordance with, the ~~Plan Administrator~~<u>Liquidating Trustee</u> Agreement.

The ~~Plan Administrator~~<u>Liquidating Trustee</u> shall be deemed the representative of each of the Debtors' Estates in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the ~~Plan Administrator~~<u>Liquidating Trustee</u> Agreement, including, without limitation (and except as otherwise provided in the ~~Plan Administrator~~<u>Liquidating Trustee</u> Agreement), the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Bankruptcy Rule 2004, including, without limitation, the right to (a) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the ~~Plan Administrator~~<u>Liquidating Trustee</u> Agreement, (b) prosecute, settle, abandon or compromise any Causes of Action, (c) make Distributions contemplated by the Plan, (d) establish and administer the Disputed Claims Reserve, (e) object to Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court objections to such claims, and (f) employ and compensate professionals and other agents, including one or more of the Professionals. <u>The United States Trustee shall have standing to be heard on all matters relating to the Liquidating Trustee and the Trust, including the removal of the Liquidating Trustee, but shall not be charged with oversight responsibilities of the Trust and Liquidating Trustee.</u>

**(x)   Wind Down and Dissolution of the Debtors**

The Plan provides that, after the Effective Date, the Debtors shall dissolve and the Trust shall be created and remain in existence for the sole purpose of liquidation and distribution of the Trust Assets. On and after the Effective Date, the ~~Plan Administrator~~<u>Liquidating Trustee</u> shall make Distributions under the Plan and shall implement the dissolution of each of the Debtors and monetization of any assets of the Trust pursuant to the ~~Plan Administrator~~<u>Liquidating Trustee</u> Agreement, any other provision of the Plan, and any applicable orders of the Bankruptcy Court, and the ~~Plan Administrator~~<u>Liquidating Trustee</u> shall have the power and authority to take any action necessary to wind down and dissolve each of the Debtors. As soon as practicable after the Effective Date, the ~~Plan Administrator~~<u>Liquidating Trustee</u> shall: (a) take any action reasonably necessary to effectuate the Wind Down; (b) file for each of the Debtors, a certificate of dissolution, together with all other necessary corporate and company documents, to effect the dissolution of the Trust under applicable non-bankruptcy law; (c) complete and file all final or otherwise required federal, state and local tax returns of the Debtors or the Trust, as applicable, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the entities comprising the Trust, the Debtors, or their Estates for any tax incurred during the administration of the Chapter 11 Cases, as determined under applicable tax laws; (d) take such other actions as the ~~Plan Administrator~~<u>Liquidating Trustee</u> may determine to be necessary or desirable to carry out the purposes of the Plan; and (e) comply with any regulatory requirements imposed on the Trust under applicable law. The filing by the ~~Plan Administrator~~<u>Liquidating Trustee</u> of certificates of dissolution on behalf of each of the Debtors shall be authorized and approved in all respects without further action under applicable

law, regulation, order or rule, including, without limitation, any action by the stockholders or the board of directors of the Debtors or the Trust, as applicable.

### (xi)    Execution of Documents and Corporation Action

The Plan provides that the Debtors will deliver all documents including, without limitation, the conveyance documents, and perform all actions reasonably contemplated with respect to implementation of the Plan. The ~~Plan Administrator~~Liquidating Trustee will be designated the authorized representative to execute on behalf of the Debtors and the Trust, in a representative capacity and not individually, any documents or instruments to be executed by the Debtors on and after the Effective Date in order to consummate the Plan.

### (xii)    Designation of ~~Plan Administrator~~Liquidating Trustee and Terms of Compensation. The initial ~~Plan Administrator~~Liquidating Trustee of the Trust will serve as ~~Plan Administrator~~Liquidating Trustee until such ~~Plan Administrator~~Liquidating Trustee resigns or is replaced in accordance with the Trust Agreement and Trust bylaws. As consideration for the ~~Plan Administrator's~~Liquidating Trustee's services, the ~~Plan Administrator~~Liquidating Trustee shall receive the compensation set forth in the Trust Agreement. In the event such person is unwilling or unable to serve as ~~Plan Administrator~~Liquidating Trustee, the Debtors shall designate a person to serve as ~~Plan Administrator~~Liquidating Trustee not later than three business days before the Confirmation Hearing and, if the Debtors fail to timely participate in the designation of a person to serve as ~~Plan Administrator~~Liquidating Trustee, the Court may designate a person to serve as ~~Plan Administrator~~Liquidating Trustee at any time before termination of the Confirmation Hearing.

### (xiii)    Vesting of Assets in the Trust. Except as otherwise provided in the Plan or in any agreement, instrument, or other document relating thereto, on or after the Effective Date pursuant to section 1141 of the Bankruptcy Code, all property of the Debtors' Estates and any property acquired by the Debtors pursuant hereto shall vest in the appropriate entity comprising the Trust, free and clear of all Liens, Claims, charges, or other encumbrances. For the avoidance of doubt, all property of the Estate of Debtor Elcom Hotel shall vest in the Trust for the Benefit of the Allowed Claimants of Elcom Hotel and all property of the Estate of Elcom Condo shall vest in the Trust for the Benefit of the Allowed Claimants of Elcom Condo, subject to the terms of this Plan. Except as may be provided in this Plan, the Trust Agreement, or the Confirmation Order, on and after the Effective Date, the Trust may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

      **(xiv)**   **Trust Authority to Prosecute Causes of Action**.  Under the Plan and pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, the Trust shall have full and exclusive authority without need for any further court approval, but subject to the terms of the Trust Agreement, to prosecute all Causes of Action, including, without limitation, the Derivative Action, transferred to the Trust by the Debtors on behalf of the Debtors which are identified, or not, in the Disclosure Statement.  The ~~Plan Administrator~~Liquidating Trustee may commence or continue, in any appropriate court or tribunal, any suit or other proceeding for the enforcement of such causes of action, and, if deemed appropriate by the ~~Plan Administrator~~Liquidating Trustee, to compromise or settle such litigation.

      All such causes of action shall remain the property of the Trust post-Effective Date and, if pursued and any recovery is ultimately realized, the proceeds of any such recovery would ultimately become Trust Assets and disbursed pursuant to the terms of the Plan and Trust Agreement.

      **(xv)**   **Substantive Consolidation.** The Plan provides for the substantive consolidation of the Debtors solely for purposes of voting, confirmation and Distributions. On and after the Effective Date (i) all assets and liabilities of the Debtors shall be treated for purposes of the Plan as though they were merged; (ii) all guarantees of the Debtors of payment, performance or collection of obligations of any other of the Debtors shall be eliminated and cancelled; (iii) all joint obligations of the Debtors and all multiple Claims against such entities on account of such joint obligations shall be considered a single Claim against the Debtors; (iv) all intercompany claims and obligations between one Debtor and any of the other Debtors, including as a result of the rejection of any executory contract or unexpired lease, shall be eliminated, extinguished and cancelled; and (v) any Claim filed against any of the Debtors shall be deemed filed against the consolidated Debtors and shall be one Claim against and a single obligation of the consolidated Debtors.

      Except as otherwise provided in the Plan, (i) all property of each Debtor shall vest in the Trust free and clear of all Claims, Liens, encumbrances, charges or other interests; and (ii) each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect before the Effective Date. Consistent with the substantive consolidation of the Debtors provided for the Plan, on the Effective Date, the consolidation of the Debtors' Estates shall be effective and effectuated pursuant to the Confirmation Order without any further action by the members or managers of any of the Debtors.

      The entry of the Confirmation Order shall constitute approval by the Bankruptcy Court, pursuant to sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Debtors' respective Estates, solely for purposes of voting on, confirmation of and Distributions under the Plan, and for no other purpose.

4233.101/~~348575.4~~349713.3          38

Notwithstanding the substantive consolidation of the Debtors, respectively, as provided herein, the substantive consolidation shall be solely for purposes of voting on, confirmation of, and Distributions under the Plan and specifically shall not:

(a)     affect the treatment proposed by the Debtors to any holder of an Allowed Secured Class 1 or Class 2 Claim against such Debtor under the Plan;

(b)     affect any claims under or with respect to any insurance policy of any Debtor (or any right to the proceeds of any such policy or policies) which shall be unaffected by substantive consolidation;

(c)     affect the legal or organizational structure of each such Debtor from and after the Effective Date;

(d)     destroy or otherwise affect the separate corporate existence of each Debtor and the ownership interest in each Debtor;

(e)     divest any Debtor of any tax attributes; or

(f)     affect any Statutory Fees paid by, or accrued in respect of, any Debtor to the U.S. Trustee or the Clerk of the Bankruptcy Court from the Petition Date through the Effective Date.

The Plan shall be deemed to be a motion, pursuant to Fed.R.Bankr.P. 9013, by the Debtors for limited and partial substantive consolidation with respect to the Plan as set forth herein. Any objection by an affected Creditor to such consolidation shall be treated as an objection to Confirmation and shall be determined by the Bankruptcy Court at the Confirmation Hearing. Failure to timely object to substantive consolidation may result in consolidation of the Debtors in accordance herewith, without further hearing.

**E.     Provisions Governing Distributions**

**(i)     Initial Distribution Date**.  The Initial Distribution date shall be the Effective Date.  On the Initial Distribution Date, or as soon thereafter as is reasonably practicable, the Debtors, the Trust, or the ~~Plan Administrator~~Liquidating Trustee, as applicable, shall make the Distributions required to be made under the Plan.

**(ii)     Disputed Claims Reserve.**

a.     **Establishment of Disputed Claims Reserve**.  On the Initial Distribution Date, and after making all Distributions required to be made on such date under the Plan, the Trust or the ~~Plan Administrator~~Liquidating Trustee, as applicable, shall establish a separate Disputed Claims Reserve for Disputed Claims, which Disputed Claims Reserve shall be administered by the ~~Plan Administrator.~~Liquidating Trustee.  The Trust or the ~~Plan Administrator~~Liquidating Trustee, as applicable, shall reserve in Cash the amount holders of Disputed Claims would be entitled to receive under the Plan if all such Disputed Claims were to become Allowed Claims (or such lesser amount as may be estimated by the Bankruptcy Court in accordance with Article 6.5 of the Plan).

b.  **Maintenance of Disputed Claims Reserve**.  To the extent that the property placed in the Disputed Claims Reserve consists of Cash, that Cash shall be deposited in an interest-bearing account. The Trust or the ~~Plan Administrator~~Liquidating Trustee, as applicable, shall hold Cash in the Disputed Claims Reserve in trust for the benefit of the holders of Claims ultimately determined to be Allowed.  The ~~Plan Administrator~~Liquidating Trustee shall, in its sole discretion, distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein and in the ~~Plan Administrator~~Liquidating Trustee Agreement, as such Disputed Claims are resolved by a Final Order, and such amounts will be distributable in respect of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date.

(iii)  **Post-Effective Date Distributions**.  The Trust or the ~~Plan Administrator~~Liquidating Trustee, as applicable, shall make the post-Effective Date Distributions required to be made under the Plan on such date as Trust or ~~Plan Administrator~~Liquidating Trustee determines within its discretion that such Distributions should be made. Any Distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by the Trust as applicable, in the Disputed Claims Reserve pursuant to Article 5.2.2 of the Plan and distributed after such Claim is Allowed. No interest shall accrue or be paid on the unpaid amount of any Distribution paid on a post-Effective Date Distribution in accordance with Article 5.3 of the Plan.

(iv)  **Record Date for Distributions**.  Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Distribution Record Date.  The Trust shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date.  In making any Distribution with respect to any Claim, the Trust as applicable, shall be entitled instead to recognize and deal with, for all purposes hereunder, only the entity that is listed on the Proof of Claim filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Distribution Record Date and upon such other evidence or record of transfer or assignment that is known to the Trust as applicable, as of the Distribution Record Date.

(v)  **Delivery of Distributions.**

a.  **General Provisions; Undeliverable Distributions**.  Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made by the Trust or the ~~Plan Administrator~~Liquidating Trustee, as applicable, at (i) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on Proofs of Claim filed by such holder or (ii) the last known address of such holder if no Proof of Claim is Filed or if the Debtors, the Trust, or the ~~Plan Administrator~~Liquidating Trustee, as applicable, has been notified in writing of a change of address.  If any Distribution is returned as undeliverable, the ~~Trust or the Plan Administrator, as applicable, may, in its discretion, make such~~Liquidating Trustee, shall use his best efforts to determine the current address of the holder of the Claim with respect to which the Distribution

was made as the Trust or the ~~Plan Administrator~~Liquidating Trustee, as applicable, deems appropriate, but no Distribution to any holder shall be made unless and until the Trust or the ~~Plan Administrator~~Liquidating Trustee, as applicable, has determined the then current address of the holder, at which time the Distribution to such holder shall be made to the holder without interest. Amounts in respect of any undeliverable Distributions made by the Trust or the ~~Plan Administrator~~Liquidating Trustee, as applicable, shall be returned to, and held in trust by, the Trust or the ~~Plan Administrator~~Liquidating Trustee, as applicable, until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code as set forth in Article 5.5.2 of the Plan.  The Trust or the ~~Plan Administrator~~Liquidating Trustee, as applicable, shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; *provided*, *however*, that its discretion may not be exercised in a manner inconsistent with any express requirements of the Plan or the Trust Agreement.

       **b.**   **Unclaimed Property**.  Except with respect to property not distributed because it is being held in the Disputed Claims Reserve, Distributions that are not claimed by the expiration of one year from the Initial Distribution Date or the Subsequent Distribution Date applicable to such distribution, shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest or revest in the Trust, and the Claims with respect to which those Distributions are made shall be automatically canceled.  After the expiration of such one-year period, the Claim of any entity to those Distributions shall be discharged and forever barred.  Nothing contained in the Plan shall require the Trust to attempt to locate any holder of an Allowed Claim ~~Except~~except as otherwise provided herein~~, all~~.  All funds or other property that vests or revests in the Trust pursuant to this Article shall be distributed by the ~~Plan Administrator~~Liquidating Trustee as follows: (1) if the aggregate sum of Unclaimed Property is greater than $20,000.00, then it will be distributed to Class 4 Claims of Elcom Hotel or Class 3 Claims of Elcom Condo, as applicable, or (2) if the aggregate sum of Unclaimed Property is $20,000.00 or less then it will be distributed to the Southern District of Florida Bankruptcy Bar Association, a not-for-profit, non-religious organization dedicated to, *inter alia*, promoting the pro bono legal representation of the indigent.

    **(vi)**   **Surrender of Canceled Instruments and Securities.**

       **a.**   **Generally**.  Except to the extent evidenced by electronic entry, as a condition of receiving any Distribution under the Plan, each holder of a certificated instrument or note must surrender such instrument or note to the ~~Plan Administrator~~Liquidating Trustee or its designee.  Any holder of such instrument or note that fails to (i) surrender such instrument or note or (ii) execute and deliver to the ~~Plan Administrator~~Liquidating Trustee to such party an affidavit of loss and/or indemnity reasonably satisfactory before the first anniversary of the Effective Date shall be deemed to have forfeited all rights and Claims and may not participate in any Distribution under the Plan.  Any Distribution so forfeited shall become the property of the ~~Plan Administrator~~Liquidating Trustee for distribution to holders of Allowed Claims in accordance with the terms and provisions hereof.

       **b.**   **Failure to Surrender Canceled Instruments**.  If any holder of an Allowed Claim evidenced by instruments, securities, or other documentation canceled pursuant to Article 5.6 of the Plan, fails to surrender such instrument, security, or other documentation or comply with the provisions of Article 5.6.1 hereof within one year after the Effective Date, its

Claim for a Distribution under the Plan on account of such instrument, security, or other documentation shall be discharged, and such holder shall be forever barred from asserting such Claim against the Trust or its property. In such case, any property held on account of such Claim shall be disposed of pursuant to the provisions set forth in Article 5 of the Plan.

(vii)    **Manner of Cash Payments Under the Plan or the Trust Agreement.** Cash payments made pursuant to the Plan or the ~~Plan Administrator~~Liquidating Trustee Agreement shall be in United States dollars by checks drawn on a domestic bank selected by the ~~Plan Administrator~~Liquidating Trustee or by wire transfer from a domestic bank, at the option of the ~~Plan Administrator~~Liquidating Trustee.

(viii)    **Time Bar to Cash Payments by Check**. Checks issued by the Trust on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void pursuant to Article 5.8 of the Plan shall be made directly to the ~~Plan Administrator~~Liquidating Trustee by the holder of the Allowed Claim to whom the check was originally issued. Any claim in respect of such voided check shall be made in writing on or before the later of the first anniversary of the Initial Distribution Date or subsequent Distribution Date on which such check was issued. After that date, all Claims in respect of void checks shall be discharged and forever barred and the proceeds of those checks shall revest in and become the property of the Trust as unclaimed property in accordance with section 347(b) of the Bankruptcy Code and be distributed as provided in Article 5.5.2 of the Plan.

(ix)    **Compliance with Tax Requirements**. In connection with making Distributions under the Plan, to the extent applicable, the ~~Plan Administrator~~Liquidating Trustee shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The ~~Plan Administrator~~Liquidating Trustee may withhold the entire distribution due to any holder of an Allowed Claim until such time as such holder provides the necessary information to comply with any withholding requirements of any governmental unit. Any property so withheld will then be paid by the ~~Plan Administrator~~Liquidating Trustee to the appropriate authority. If the holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within six (6) months from the date of first notification to the holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such holder's Distribution shall be treated as an undeliverable Distribution in accordance with Article 5.5 of the Plan.

(x)    **No Payments of Fractional Dollars**. Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

(xi)    **Interest on Claims**. Except as specifically provided for in the Plan or the Confirmation Order, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a

final distribution is made thereon if and after that Disputed Claim becomes an Allowed Claim. Except as expressly provided herein or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be allowed to the extent that it is for postpetition interest or other similar charges.

    **(xii)**  **No Distributions in Excess of Allowed Amount of Claim.** Notwithstanding anything to the contrary contained in the Plan, no Holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of that Claim.

    **(xiii)**  **Setoff and Recoupment**.  The Debtors, Trust, or the ~~Plan Administrator~~Liquidating Trustee, as applicable, may, but shall not be required to, set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that the Debtors, the Estates, or the Trust may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors, the Estates, or the Trust of any right of setoff or recoupment that any of them may have against the holder of any Claim.

 **F.**  **Disputed Claims**

    **(i)**  **No Distribution Pending Allowance**.  Notwithstanding any other provision of the Plan, the Debtors, the Trust, or the ~~Plan Administrator~~Liquidating Trustee shall not distribute any Cash or other property on account of any Disputed Claim unless and until such Clam becomes Allowed.

    **(ii)**  **Resolution of Disputed Claims**.  Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Debtors, the ~~Trust, or the Plan Administrator, as applicable~~Liquidating Trustee, on behalf of the Trust, shall have the right to the exclusion of all others (except as to the Professionals' applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code) to make, file, prosecute, settle, compromise, withdraw, or resolve in any manner approved by the Bankruptcy Court, objections to Claims. The costs of pursuing the objections to Claims shall be borne by the Estates or the Trust, as applicable.

    **(iii)**  **Objection Deadline**.  All objections to Disputed Claims shall be filed with the Bankruptcy Court and served upon the holders of each such Claim on or before the 90th day after the Effective Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing.

    **(iv)**  **Deadline for Responding to Claim Objections**.  A Claimant whose Claim has been objected to must file with the Bankruptcy Court and serve upon the parties identified in Article 13.12 of the Plan a response to such claim objection within 30 days after service of any objection to its Claim. Failure to file such a response within the 30-day time period shall be cause for the Bankruptcy Court to enter a default judgment against the non-responding Claimant and to thereby grant the relief requested in the Claim objection.

    **(v)**  **Estimation of Claims**.  At any time, subsequent to the Effective Date, the Trust or the ~~Plan Administrator~~Liquidating Trustee, as applicable, may request that the

4233.101/~~348575.4~~349713.3        43

Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Debtors, the Trust, or the ~~Plan Administrator~~Liquidating Trustee has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.

(vi)    **Disallowance of Claims.**    Except as otherwise agreed, any and all Proofs of Claim filed after the Bar Date or Bar Date for Governmental Units, as applicable, shall be deemed disallowed and expunged as of the Effective Date without any further notice or action, order or approval of the Bankruptcy Court, and holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation Date the Bankruptcy Court has entered an order deeming such Claim to be timely filed.

G.    **Executory Contracts**

Executory Contracts entered into by the Debtors prior to the Petition Date, shall be treated as follows:

(i)    **Assumption and Rejection.**    All Executory Contracts not otherwise assumed pursuant to Section 365 of the Bankruptcy Code prior to the Effective Date shall be deemed rejected as of the Effective Date.  Notwithstanding anything to the contrary set forth in the prior sentence, the Debtor may designate any Executory Contract to be assumed or assumed and assigned on or before the Effective Date and such Executory Contract shall be assumed or assumed and assigned as of the Effective Date. Pursuant to the Auction Procedures Order, the executory contracts to be assumed and assigned to the Prevailing Bidder will be identified within two business days after the Closing Date. A list of Scheduled Contracts which may potentially be assumed and assigned, with the cure amount, if any, believed by the Debtors to be required in order to assume and assign each such contract, is to be provided ten days after the entry of the Auction Procedures Order. The Proposed Purchaser's Purchase Agreement contemplates that at least 95 of the current Rental Management Agreements between the Debtors and individual unit owners will be assumed and assigned to the Prevailing Bidder at closing, and that the individual unit owners will not have the right to cancel the Rental Management Agreements as a result of a change in ownership or management of the Property provided that the Prevailing Bidder employs as the operator or manager of the Property an entity which operates or a manages five-star hotels.

The Associations contend that paragraph 15(c) of the Rental Management Agreements provide individual unit owners the right to terminate the Rental Management Agreements as a result of (i) any termination of the current hotel manager (Benchmark); (ii) the winding up of the receivership estate created under the Receivership Orders; or (iii) the sale or transfer of the Hotel Lot. The Debtors will seek a determination that any such provision is an unenforceable anti-assignment clause.

      **(ii)**     **Approval of Assumption or Rejection**.  Entry of the Confirmation Order shall constitute the approval, pursuant to Sections 363(b), (f) and (m) and 365(a) and (f) of the Bankruptcy Code, of (i) the assumption or assumption and assignment of the Executory Contracts identified in accordance with Section 7.1 of the Plan and (ii) the rejection of the remaining Executory Contracts.

      **(iii)**     **Rejection Claims**.  *Except as the Bankruptcy Court in a previous order, or unless the Bankruptcy Court, the Bankruptcy Code, or the Bankruptcy Rules establish an earlier deadline with regard to the rejection of particular Executory Contracts, any Claims arising out of the rejection of Executory Contracts pursuant to Section 7.1 of the Plan must be filed with the Bankruptcy Court and served upon the Debtors and the* ~~Plan Administrator~~*Liquidating Trustee no later than thirty days after entry of the Confirmation Order.  Any Claims not filed within the time set forth in the Rejection Order or as provided above, are, or will be, forever barred and will not receive any distributions under the Plan.  All Claims arising from the rejection of an Executory Contract shall be treated as a General Unsecured Claim.*

**H.**     **Conditions Precedent to Confirmation and the Effective Date**

      **(i)**     **Conditions to Confirmation**.  The following are conditions precedent to entry of the Confirmation Order that must be satisfied or waived in accordance with Article 8.3 of the Plan.

      a.     The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

      b.     All objections to confirmation of the Plan are either withdrawn, resolved, or overruled.

      c.     The most current version of all of the schedules, documents, and exhibits related to the Plan and required to be filed shall have been filed with the Bankruptcy Court.

      **(ii)**     **Conditions Precedent to the Effective Date**.  The following are conditions precedent to the Effective Date that must be satisfied or waived in accordance with Article 8.3 of Plan.

      a.     The Confirmation Order shall not be stayed and shall be in full force and effect.

      b.     The ~~Plan Administrator~~Liquidating Trustee shall have been appointed in accordance with the terms of the Plan and the ~~Plan Administrator~~Liquidating Trustee/Trust Agreement.

        **(iii)**    **Waiver of Conditions Precedent**.    The Debtors may waive the occurrence of or modify any condition precedent in Article 8 of the Plan.  Any such written waiver of a condition precedent set forth in Article 8 of the Plan may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.  The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

**I.**    **Effect of Confirmation**

        **(i)**    **Post-Effective Date Assets**.    On or after the Effective Date, the ~~Plan Administrator~~Liquidating Trustee may dispose of the Trust Assets free of any restrictions of the Bankruptcy Code, but in accordance with the provision of the Plan and the Trust Agreement.

        **(ii)**    **Jurisdiction of the Court**.    Pursuant to sections 105(a) and 1142 of the Bankruptcy Code; and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law.

        **(iii)**    **Binding Effect**.    Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Confirmation Date, the provision of this Plan shall bind any holder of a Claim against or Interest in the Debtors and their respective successors and assigns, whether or not the Clam or Interest of such holder is Impaired under this Plan and whether or not such holder has accepted the Plan.

**J.**    **Discharge, Release and Extinguishment of Liens, Claims, Interests and Encumbrances**

        **(i)**    **Compromise and Settlement**.    Pursuant to sections 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the Distributions and other benefits provided by the Plan, the Plan shall constitute a good faith compromise of all Claims and Interests.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and the holders of Claims and Interests.

        **(ii)**    **Exculpation**.  **Notwithstanding anything in the Plan to the contrary, neither the Debtors nor any of their respective present or former members, managers, officers, directors, employees, general or limited partners, advisors, attorneys, agents, successors or assigns (excluding Jorge Arevalo, Juan Camilo Arevalo, entities owned solely by either Jorge Arevalo or Juan Camilo Arevalo, and  entities owned jointly by Jorge Arevalo and Juan Camilo Arevalo), shall have or incur any liability to any holder of a Claim or Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the administration of these Chapter 11 bankruptcy proceedings, the pursuit of**

confirmation of the Plan, the Disclosure Statement, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan occurring prior to the Effective Date, provided that the terms of this Section shall not apply to any liability for willful misconduct, gross negligence, or ultra vires acts.

       (iii)   **Release by Holders of Certain Impaired Claims.**  Pursuant to Sections 1123(b)(3) and (6) of the Bankruptcy Code and Bankruptcy Rule 9019, this Plan, and the provisions and distributions set forth herein, is a full and final settlement and compromise of all Claims and causes of action, whether known or unknown, that holders of Claims against or Interests in the Debtors may have against any of the Released Parties[7].  As of the Effective Date, in consideration for the distributions and other treatment afforded under this Plan, and the obligations of the Debtors and the Reorganized Debtors under this Plan, each holder of a Claim against or Interest in the Debtors shall be deemed to forever release, waive and discharge all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the rights to enforce the Debtors' or the Reorganized Debtors' obligations under this Plan and the releases and other agreements and documents delivered thereunder) against the Released Parties, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases or the conduct thereof, or this Plan.

The release of the Released Parties pursuant to the Plan is in consideration of their contributions to the Debtors' ability to propose and implement the Plan, including, without limitation, certain of the Released Parties' contribution of $676,190.87 as a capital contribution to the Debtors at the commencement of the case as provided in the Notice of Funding [ECF No. 90], certain of the Released Parties' agreement to provide post-petition financing to the Debtors on an unsecured basis, thereby enabling the Debtors to continue to maintain operations and fund ongoing expenses without encumbering the Debtors' assets; and the Released Parties' agreement to support substantive consolidation of the Elcom Hotel and Elcom Condo cases for distribution purposes, the consequence of which is to significantly dilute the prospective recoveries on certain of the Released Parties' claims in the Elcom Condo case. The Associations believe that the Debtors' proffered reasons in support of providing the releases to the Released Parties lack merit for each of the Released Parties. The Debtors disagree with the Associations' assertions.

      (iv)   **Preservation of Rights of Action.**

---

[7] **Released Parties** shall mean the Debtors, Thomas Sullivan individually, F9 Properties, LLC f/k/a ANO, LLC, Elevation Communities, LLC, OBH Funding, LLC, F9 Investments, LLC, and each of their respective current and former directors, officers, employees, representatives, members, affiliates, agents, counsel, financial advisors, and professionals (with the specific exception of (1) Jorge Arevalo, (2) Juan Camilo Arevalo, (3) entities owned solely by either Jorge Arevalo or Juan Camilo Arevalo, and (4) entities owned jointly by Jorge Arevalo and Juan Camilo Arevalo, who are not released from claims and causes of action that have or may be brought by holders of impaired Claims).

**Formatted:** No widow/orphan control, Don't keep with next, Don't keep lines together

a.    Vesting of Causes of Action.

Except as otherwise provided in the Plan or Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors may hold against any entity shall vest upon the Effective Date in the Trust.

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the ~~Plan Administrator~~Liquidating Trustee shall have the exclusive right to institute, prosecute, abandon, settle, or compromise any Causes of Action, in accordance with the terms of the Trust Agreement and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in any of the Chapter 11 Cases. Without limiting the generality of the foregoing, upon the Effective Date, the ~~Plan Administrator~~Liquidating Trustee, or Trust, as applicable, shall be deemed substituted for the relevant Debtor in any pending adversary proceedings to which one or more of the Debtors were a party and any appeals arising out of such adversary proceedings.

Causes of Action and any recoveries therefrom shall remain the sole property of the Trust (for the sole benefit of the Beneficiaries), as the case may be, and holders of Claims shall have no right to any such recovery, unless authorized under the Plan.

b.    Preservation of All Causes of Action Not Expressly Settled or Released.

Unless a Cause of Action against a holder or other entity is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order (including the Confirmation Order), the Trust and the ~~Plan Administrator~~Liquidating Trustee expressly reserve such Cause of Action for later adjudication by the Trust or the ~~Plan Administrator~~Liquidating Trustee (including, without limitation, Causes of Action not specifically identified or described in the Disclosure Statement or elsewhere or of which the Debtors, the Trust, or the ~~Plan Administrator~~Liquidating Trustee may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors, the Trust, or the ~~Plan Administrator~~Liquidating Trustee at this time or facts or circumstances which may change or be different from those the Debtors, the Trust, or the ~~Plan Administrator~~Liquidating Trustee now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata,* collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or occurrence of the Effective Date based on the Disclosure Statement, Plan, or Confirmation Order, except where such Causes of Action have been released in the Plan or any other Final Order (including the Confirmation Order).  In addition, the Debtors, the Trust, and the ~~Plan Administrator~~Liquidating Trustee expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which one or more of the Debtors are a defendant or an interested party, against any entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the

Debtors, should assume that any such obligation, transfer, or transaction may be reviewed by the ~~Plan Administrator~~Liquidating Trustee subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (i) such entity has filed a Proof of Claim against the Debtors in their Chapter 11 Cases; (ii) the Debtors, the Trust, or the ~~Plan Administrator~~Liquidating Trustee have objected to any such entity's Proof of Claim; (iii) any such entity's Claim was included in the Schedules; (iv) the Debtors, the Trust, or the ~~Plan Administrator~~Liquidating Trustee have objected to any such entity's scheduled Claim; or (v) any such entity's scheduled Claim has been identified by the Debtors, the Trust, or the ~~Plan Administrator~~Liquidating Trustee as disputed, contingent, or unliquidated.

(v) **Release and Injunction**. The rights afforded in the Plan and the treatment of all Claims and Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against any of the Debtors' Estates, or any of the assets or properties of the Trust, or the Debtors' Estates. On the Effective Date, all such Claims against, and Interests in, the Debtors' Estates shall be satisfied and released in full.

Except as otherwise provided in the Plan, any entity that has held, holds or may hold Claims against or Interests in any of the Debtors is permanently enjoined from taking any of the following actions against any of the Debtors' Estates and property thereof, the ~~Plan Administrator~~Liquidating Trustee or any other assets or properties of the Debtors or the Trust on account of any such Claims or Interests: (i) commencing or continuing, in any manner or in any place, any suit, action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner or in any place, any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors; and (v) commencing or continuing, in any manner or in any place, any suit, action or other proceeding that does not comply with or is inconsistent with the provisions of this Plan; provided, however, that nothing contained herein shall preclude such entity from exercising its rights pursuant to and consistent with the terms of this Plan.

(vi) **Injunction Against Interference with the Plan**. Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present employees, agents, officers, directors or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan, except with respect to actions any such entity may take in connection with the pursuit of appellate rights with respect to the Confirmation Order.

(vii) **Releases of Liens**. Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against property of the Estates shall be fully released and discharged and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interest shall revert to the Trust and the ~~Plan Administrator~~Liquidating Trustee.

(viii) **No Discharge of Debtors**. In accordance with the Plan, the Debtors are not obtaining a discharge pursuant to section 1141(d)(1) of the Bankruptcy Code, and nothing in this Plan shall be interpreted as giving or providing the Debtors with such a discharge.

       **(ix)**    **United States Securities Commission**.  Nothing in this Plan or the Confirmation Order is intended to, or shall be construed as restricting or otherwise limiting the ability of the United States Securities and Exchange Commission (the "**Commission**") to perform its statutory duties with respect to any person or entity in any nonbankruptcy forum, pursuant to otherwise applicable law.

    **K.**    **Substantial Consummation**

       **(i)**    **Substantial Consummation**.  The Plan shall be deemed substantially consummated immediately on the completion of all material actions required to be undertaken at the Effective Date.

       **(ii)**    **Notice of Effective Date**.  Promptly after occurrence of the Effective Date, the Debtors shall file with the clerk of the Bankruptcy Court a notice that the Plan has become effective; *provided, however,* that the failure to file such notice shall not affect the effectiveness of the Plan or the rights or substances obligations of any entity hereunder.

       **(iii)**    **Final Decree**.  On substantial consummation, the Debtors or the ~~Plan Administrator~~Liquidating Trustee may move for a final decree closing the case and requesting such other orders as may be necessary and appropriate.

    **L.**    **Retention of Jurisdiction**

       **(i)**    **Retention of Jurisdiction**.  Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court, even after the cases have been closed, shall have jurisdiction to the fullest extent of the law over all matters arising under, arising in, or relating to the Debtors' Chapter 11 cases, including, but not limited to, proceedings to:

       a.    ensure that the Plan is carried out;

       b.    enter such orders as may be necessary or appropriate to implement, consummate, or enforce the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan or the Disclosure Statement;

       c.    consider any modification of the Plan under Section 1127 of the Bankruptcy Code;

       d.    hear and determine all Claims, controversies, suits and disputes against Debtor to the extent permitted under 28 U.S.C. § 1334;

       e.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim, including the resolution of any and all objections to the allowance or priority of Claims;

       f.    hear, determine, and adjudicate any litigation involving the Avoidance Actions or other claims or causes of action constituting Estate Property;

       g.    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving Debtor that may be pending on or commenced after the Effective Date;

       h.    resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or the Trust, or

any entity's obligations incurred in connection with the Plan or the Trust, or any other agreements governing, instruments evidencing, or documents relating to any of the foregoing, including the interpretation or enforcement of any rights, remedies, or obligations under any of the foregoing;

i.      hear and determine all controversies, suits, and disputes that may arise out of or in connection with the enforcement of any and all subordination and similar agreements among various creditors pursuant to Section 510 of the Bankruptcy Code;

j.      hear and determine all requests for compensation and/or reimbursement of expenses that may be made for fees and expenses incurred before the Effective Date;

k.      enforce any Final Order, the Confirmation Order, the final decree, and all injunctions contained in those orders;

l.      enter an order concluding and terminating this case;

m.      correct any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order;

n.      determine all questions and disputes regarding title to the Trust Assets and any other assets of Debtors;

o.      classify the Claims of any Claim holders and the treatment of these Claims under the Plan, to re-examine Claims that may have been allowed for purposes of voting, and to determine objections that may be filed to any Claims;

p.      take any action described in the Plan involving the post-confirmation Debtor;

q.      enter a final decree in Debtors' cases as contemplated by Bankruptcy Rule 3022;

r.      enforce, by injunction or otherwise, the provisions set forth in the Plan, the Trust, the Confirmation Order, any final decree, and any Final Order that provides for the adjudication of any issue by the Bankruptcy Court;

s.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated; and

t.      adversary proceeding number 13-01590-RAM.

        **(ii)    Failure of Bankruptcy Court to Exercise Jurisdiction.**    If the Bankruptcy Court abstains or exercises discretion not to hear any matter within the scope of its jurisdiction, nothing herein shall prohibit or limit the exercise of jurisdiction by any other tribunal of competent jurisdiction.

        **M.      Miscellaneous Provisions**

        **(i)      Final Fee Applications.**    The deadline for submission by Professionals of applications for Professional Fee Claims for Bankruptcy Court approval shall be 30 days after entry of the Confirmation Order, unless otherwise ordered by the Bankruptcy Court.  Except as provided in the Plan or by order of the Bankruptcy Court, any Professional Fee Claim for which an application or request for payment is not filed within such time period shall be discharged and forever barred.

        **(ii)      Modification of Plan.**    Subject to the limitations contained in the Plan: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy

Formatted: Indent: Left: 0", First line: 1"

Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors, Trust, or the ~~Plan Administrator~~Liquidating Trustee, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

   **(iii)** **Revocation of Plan**.  The Debtors reserve the right to withdraw the Plan prior to the entry of the Confirmation Order, and to file subsequent Chapter 11 plans.  If the Debtors withdraw the Plan, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any claims by or against, or any Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

   **(iv)** **Severability and Plan Provisions**.  If prior to entry of the Confirmation Order any term or provision of the Plan that does not govern the treatment of Claims or Interests is held by the Bankruptcy Court to be invalid, void, or unenforceable, at the request of the Debtors, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term of provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable to its terms.

   **(v)** **Successors and Assigns**.  The rights, benefits, and obligations of any entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

   **(vi)** **Governing Law**.  Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture, or other agreement or document entered into in connection herewith, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, without giving effect to the principles of conflict of laws thereof.

   **(vii)** **Reservation of Rights**.  Except as expressly set forth in the Plan, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (i) the Debtors; (ii) the Debtors with respect to the holders of Claims or Interests or other parties-in-interest; or

4233.101/~~348575.4~~349713.3       52

(iii) any holder of a Claim or other party-in-interest prior to the Effective Date.

      **(viii)**   **Section 1146 Exemption**.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

      **(ix)**   **Further Assurances**.   The Debtors, the Trust, the ~~Plan Administrator~~Liquidating Trustee, all holders of Claims receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

      **(x)**   **Venue of Proceedings**.  Without limiting in any way the effect of Article 10 of the Plan, should any holder of a Claim or Interest or other party in interest file an action against any of the Debtors, any officer or employee of the Debtors during the Chapter 11 Cases, the Trust, or the ~~Plan Administrator~~Liquidating Trustee (or any professional retained or employed by any of the foregoing) in connection with any Claim or Cause of Action arising after the Petition Date from or related to the Chapter 11 Cases, including this Plan, venue of any such action shall lie only in the Bankruptcy Court.

      **(xi)**   **Service of Documents**.  Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors shall be sent by first class U.S. mail, postage prepaid as follows:

To the Debtors:

> **KOZYAK TROPIN & THROCKMORTON, P.A.**
> 2525 Ponce de Leon Blvd., 9th Floor
> Miami, Florida 33134
> Attn: Corali Lopez-Castro, Esq.
> Phone: 305-372-1800
> Fax: 305-372-3508
> Email: clc@kttlaw.com

To the ~~Plan Administrator~~Liquidating Trustee:

> **TBD**

To the United States Trustee:

> **Office of the United States Trustee**
> Steven D. Schneiderman, Esq.
> 51 S.W. First Avenue, Suite 1204
> Miami, Florida 33130
> Tel: (305) 536-7285
> Fax: (305) 536-7360
> Email: steven.d.schneiderman@usdoj.gov

> **(xii)** **Filing of Additional Documents**. On or before the Effective Date, the Debtors, Trust, or ~~Plan Administrator~~Liquidating Trustee, as applicable, may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, including, but not limited to, the Plan Supplement.

> **(xiii)** **Entire Agreement**. The Plan sets forth the entire agreement and undertaking related to the subject matter hereof and supersedes all prior discussions and documents. The Estates shall not be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein.

## VII.   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a summary of the confirmation process for a Chapter 11 plan. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors.

A.      **The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a hearing to consider confirmation of a plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation.

B.      **Confirmation Standards**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code; (2) it has complied or will have complied with all of the requirements of Chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith.  Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

1.      The Plan complies with all applicable provisions of the Bankruptcy Code.

2.      The Debtors, as the Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

3.      The Plan has been proposed in good faith and not by any means forbidden by law.

4.      Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment: (a) made before the confirmation of the Plan will be reasonable; or (b) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.

5.      Each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.  Each holder of an Impaired Interest has accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

6.      Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims or Interests pursuant to section 1129(b) of the Bankruptcy Code.

7.    Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that: (a) Holders of Administrative Claims will receive, on account of such Claims, Cash equal to the Allowed amount of such Claim on the Effective Date of the Plan, or as soon thereafter as is reasonably practicable; (b) Holders of Claims specified in section 507(a)(4), 507(a)(5), or 507(a)(7) of the Bankruptcy Code will receive Cash on the Effective Date equal to the Allowed amount of such Claim; and (c) Holders of Claims specified in section 507(a)(8) of the Bankruptcy Code will receive on account of such Claim regular installment payments of Cash of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim over a period ending not later than five years after the Petition Date.

8.    At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any Insider holding a Claim in that Class.

9.    Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization (which it does in this instance).

10.   The Debtors have paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

11.   In addition to the filing fees paid to the clerk of the Bankruptcy Court, quarterly fees will be paid no later than the last day of the calendar month following the calendar quarter for which the fee is owed in the Debtors' Chapter 11 Cases for each quarter to the U.S. Trustee, until the Chapter 11 Cases are closed, converted, or dismissed, whichever occurs first.

**C.    Financial Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation, that confirmation is not likely to be followed by the liquidation of the Debtors, unless such liquidation is proposed in the Plan. The Plan contemplates that all assets of the Debtors ultimately will be disposed of and all proceeds of the assets will be distributed to the holders of Allowed Claims pursuant to the terms of the Plan. Since no further reorganization of the Debtors will be possible, the Debtors believe that the Plan meets the feasibility requirement. In addition, based upon the proceeds resulting from the liquidation, the Debtors believe that sufficient funds will exist at confirmation to make the payments required by the Plan.

**D.    Best Interest of Creditors Test**

Pursuant to section 1129(a)(7) of the Bankruptcy Code (often called the "Best Interests Test"), confirmation of a plan requires a finding that the plan is in the "best interests" of creditors. Under the "best interests" test, the Bankruptcy Court must find (subject to certain exceptions) that the Plan provides, with respect to each Impaired Class, that each holder of an Allowed Claim or Interest in such Impaired Class has either (a) accepted the Plan or (b) will

receive or retain under the Plan property of a value, as of the Plan's assumed Effective Date, that is not less than the value such non-accepting holder would receive or retain if the Debtors were to be liquidated under Chapter 7 of the Bankruptcy Code. The Debtors believe that satisfaction of this test is established by the Liquidation Analysis.

To determine what holders of Claims and Interests would receive if the Debtors were liquidated, the Bankruptcy Court must determine how the assets and properties of the Debtors would be liquidated and distributed in the context of a Chapter 7 liquidation case.

Debtors' costs of liquidation under Chapter 7 would include the fees payable to a trustee in bankruptcy and to any additional attorneys and other professionals engaged by such trustee and any unpaid expenses incurred by Debtors during the Bankruptcy Cases, including compensation of attorneys and accountants. The additional costs and expenses incurred by a trustee in a Chapter 7 liquidation could be substantial and would decrease the possibility that Unsecured Creditors and holders of Interests would receive meaningful distributions. The foregoing types of Claims arising from Chapter 7 administration and such other Claims as may arise in Chapter 7 or result from the pending Bankruptcy Cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay the Claims of Unsecured Creditors. Liquidation in Chapter 7 might substantially delay the date at which Creditors would receive any Distribution.

The Debtors have carefully considered the probable effects of liquidation under Chapter 7 on the ultimate proceeds available for distribution to Creditors and holders of Interests, including the following:

1.  the possible costs and expenses of the Chapter 7 trustee or trustees;

2.  the possible adverse effect on recoveries by Creditors under Chapter 7 due to reduced sale prices for the Debtors' assets caused by the forced Chapter 7 liquidation; and

3.  the possible substantial increase in Claims, which would rank in higher priority to or on a parity with those of Unsecured Creditors.

**E.    Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (ii) cures any default and reinstates the original terms of such obligation; or (iii) provides that, on the Effective Date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

4233.101/348575.4349713.3                                                    57

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

The Claims in Classes 1 and 2 for Elcom Hotel and Classes 1 and 2 for Elcom Condo are not impaired under the Plan, and, as a result, the holders of such Claims are conclusively presumed to have accepted the Plan.

The voting Classes are impaired under the Plan, and the holders of Claims in such Classes are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein.

**F.**     **Confirmation Without Acceptances by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a Plan even if all other impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or conclusively presumed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

**(i)**     **No Unfair Discrimination**

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

**(ii)**     **Fair and Equitable Test**

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the non-accepting class, the test sets different standards depending on the type of claims or equity interests in such class.

Secured Claims:  The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

Unsecured Claims:  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

Equity Interests: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (a) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (i) the allowed amount of any fixed liquidation preference to which such holder is entitled; (ii) any fixed redemption price to which such holder is entitled; or (iii) the value of such interest; or (b) if the class does not receive the amount as required under (a), no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Debtors will seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code in view of the conclusively presumed rejection by Class 5 for Elcom Hotel and by 4 for Elcom Condo.  To the extent that any of the voting Classes vote to reject the Plan, the Debtors further reserve the right to (a) seek confirmation of the Plan under  section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article 13.2 of the Plan.

The votes of holders of Interests in Class 5 for Elcom Hotel and Class 4 for Elcom Condo are not being solicited because, as set forth in Article 3 of the Plan, there will be no distribution to either of these Classes and these Interests will be canceled.

Notwithstanding the conclusively presumed rejection by Class 5 for Elcom Hotel and Class 4 for Elcom Condo or any Class that votes to reject the Plan, the Debtors do not believe that the Plan discriminates unfairly against any impaired Class of Claims or Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

**VIII.  RISK FACTORS**

**A.      Certain Bankruptcy Law Considerations**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect Distributions available to holders of Allowed Claims under the Plan, but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

**(i)      Parties in Interest May Object to the ~~Plans~~Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Interests under their Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

As of the date of this Disclosure Statements, the Associations believe that the Plan unfairly discriminates, in violation of section 1129(b) of the Bankruptcy Code, against the general unsecured creditors holding claims in Class 5 ("General Unsecured Claims"). The Associations believe that no justification exists for separately classifying the Class 4 ("General Unsecured Vendor Claims") from Class 5.

**(ii)     Failure to Satisfy Vote Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative Chapter 11 plan.  There can be no assurance that the terms of any such alternative Chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

**(iii)    The Debtors May Not be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial restructuring unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Formatted: Font: Not Bold

Formatted: Justified

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Confirmation of the Plan is also subject to certain conditions precedent as described in Article 8 of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims will receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan, or no distribution of property whatsoever under the Plan.

       (iv)    **<u>Nonconsensual Confirmation</u>**

In the event that any impaired class of claims or equity interests does not accept a Chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that their Plan satisfies these requirements, and the Debtors may request such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual confirmation of the Plan may result in, among other things, increased expenses relating to Administrative Claims for professionals.

       (v)    **<u>The Debtors May Object to the Amount or Classification of a Claim</u>**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection may not receive its expected share of the estimated Distributions described in this Disclosure Statement and may not be entitled to vote on the Plan.

**(vi)**    <u>Non-Occurrence of 363 Sale</u>

The Debtors believe that the primary risk of this Plan is that the Plan will not be confirmed or that one or more conditions to the Effective Date of the Plan will not occur. The main condition that could prevent the Effective Date of the Plan would be that no sale, or an insufficient sale, results from the Sale and the Proceeds are insufficient to satisfy the Allowed Claims as contemplated under the Plan. The Debtors cannot guarantee that this, or any other condition under the Plan, will be satisfied or waived.

**(vii)**    <u>Risk of Non-Occurrence of the Effective Date</u>

Although the Debtors believe that the Effective Date may occur expeditiously after the Confirmation Date, there can be no assurance as to time or as to whether the Effective Date will, in fact, occur. Moreover, the Debtors have not agreed o make certain changes to the Plan as requested by the Associations and described in their respective objections to the approval of the Disclosure Statement [ECF Nos. 401, 404]. Therefore, it is possible that one or both of the Associations (or another interested party) could appeal the Confirmation Order. Among other things, if the Confirmation Order is appealed and/or stayed, such an appeal or stay could delay or prevent the Effective Date from occurring.

**B.**    **Other Risk Factors Identified by the Associations**

The Associations assert that the Trust does not adequately protect the interests of the Associations and the Debtors' other unsecured creditors because the Debtors, not the Associations, choose the Liquidating Trustee and the Trust does not provide for any meaningful role (such as an oversight committee) for the Associations or any other unsecured creditor to police the actions of the Liquidating Trustee. The Debtors note that the Liquidating Trustee is an independent party with no connections to the Debtors or other parties in interest, whose selection will be approved by the Bankruptcy Court, and that all creditors and parties in interest will have an opportunity to communicate with and advise the Liquidating Trustee with regarding to the management of the Trust.

The Associations believe that the Plan at Section 10.3 proposes to grant releases to certain Released Parties that are named as defendants in the Derivative Action. If the Plan is confirmed by the Bankruptcy Court and such releases are granted to the defendants, then it will be impossible to pursue such defendants in the Derivative Action. The Associations believe that the causes of action asserted against all of the defendants in the Derivative Action have merit. The Debtors note that the Released Parties have provided substantial consideration in exchange for the Releases provided in the Plan, as described in Section _____ hereof.

**Formatted:** Justified

## IX.    DISCLAIMERS

### A.    Information Contained Herein Is For Soliciting Votes and Potential Exists for Inaccuracies

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes. The statements contained in this Disclosure Statement are made as of the date hereof, and unless another time is specified herein, neither the delivery of this Disclosure Statement nor an exchange of rights made in connection herewith shall, under any circumstance, create an implication that there has been no change in the facts set forth herein since the date hereof. No representations concerning the Debtors, the value of their Property, or the value of any benefits offered to holders of claims or interests in connection with the Plan, are authorized by the Debtors, other than as set forth in this Disclosure Statement. Unless ordered to do so by the Bankruptcy Court, the Debtors have no duty to update this Disclosure Statement.

### B.    This Disclosure Statement was Not Approved by the Securities and Exchange Commission and May Not Comply With Federal and State Securities Laws

Any benefits offered to the holders of Claims or Interests, in accordance with the Plan, which may constitute securities, have not been approved or disapproved by the Commission, or by a relevant government authority of any state of the United States. Neither the Commission, nor any such state authority, has passed upon the accuracy of this Disclosure Statement of the merits of the Plan.

### C.    No legal advice is being provided in this Disclosure Statement.

This Disclosure Statement is not legal advice to you. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan, or object to confirmation of the Plan.

### D.    Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The ~~Plan Administrator~~Liquidating Trustee may seek to investigate, file, and prosecute objections to Claims and Interests and may object to Claims after the confirmation or Effective Date of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to such Claims.

### E.    No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action, or rights of the Debtors or liquidating Debtors (or any party in interest, as the case may be) to object to that holder's Allowed Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any

Claims, Causes of Action of the Debtors, their Estates, or liquidating Debtors are specifically or generally identified herein.

**F.      No Representations Outside this Disclosure Statement are Authorized**

No representations concerning or relating to the Debtors, these Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

**X.      ALTERNATIVES TO CONFIRMATION**

If this case were converted to a Chapter 7 liquidation, the Debtors believe that their business operations would cease or be substantially hampered and the enterprise value of the Debtors would drastically diminish. This would likely have a negative effect on the Claimants in these bankruptcy cases because they may not receive full payment on their Allowed Claim. Also, under Chapter 7 liquidation, a Chapter 7 bankruptcy trustee would be appointed to take possession and title of Debtors' Real Property. The Chapter 7 trustee will be a different party from the Debtors, thus causing further duplication of professional time and services in getting acquainted with the facts of the case. Lastly, Sullivan or his affiliated entities would be unlikely to contribute any capital to the Debtors pending their liquidations.

**XI.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES**

The following is a summary of certain United States federal income tax consequences of the Plan to the Debtors and certain holders of Claims and Interests. This summary is based on the Internal Revenue Code, Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of Claims or Interests that are not "United States persons" (as such term is defined in the Internal Revenue Code) or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, passthrough Entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, and regulated investment companies). The following discussion assumes that holders of Claims or Interests hold such Claims or Interests as "capital assets" within the meaning of section 1221 of the Internal Revenue Code. Moreover, this summary does not purport to cover all aspects of United States federal income taxation that may

apply to the Debtors and holders of Claims and Interests based upon their particular circumstances.  Additionally, this summary does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, or foreign tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

**IRS  CIRCULAR  230  DISCLOSURE**:  TO  ENSURE  COMPLIANCE  WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE  OF  AVOIDING  TAX-RELATED  PENALTIES  UNDER  THE  INTERNAL REVENUE CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE MARKETING OR PROMOTION  OF  THE  TRANSACTIONS  OR  MATTERS  ADDRESSED  BY  THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.    **Certain United States Federal Income Tax Consequences to the Holders of Allowed Claims and Interests**

The U.S. federal income tax consequences of the implementation of the Plan to the Claimants, typical of the holders of Claims and Interests who are entitled to vote to accept or reject the Plan, will depend on a number of factors, including (i) whether the Claim constitutes a "security" for U.S. federal income tax purposes, (ii) the nature and origin of the Claim, (iii) the manner in which the holder acquired the Claim, (iv) the length of time the Claim has been held, (v) whether the Claim was acquired at a discount, (vi) whether the holder has taken a bad debt deduction or loss with respect to the Claim (or any portion thereof) in the current year or in any prior year, (vii) whether the holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (viii) the holder's method of tax accounting, (ix) whether the Claim is an installment obligation for U.S. federal income tax purposes, and (x) the timing of any distributions under the Plan.

(i)    **Gain or Loss Recognition on the Satisfaction of Claims and Character of Gain or Loss**

Holders of Claims will generally recognize gain or loss with respect to their Claims in an amount equal to the difference between the amount realized (generally, the amount of cash and the fair market value of any other property received) with respect to their Claims and their respective tax bases in their Claims. Thus, it is possible that certain holders of Claims may

recognize gain or income as a result of distributions under the Plan. In general, the character of any gain or loss recognized by any such Claimholder as capital or ordinary will depend on whether the Claim constitutes a capital asset in the hands of the Claimholder. To the extent that a debt instrument is acquired after its original issuance for less than the issue price of such instrument, it will have market discount. A holder of a Claim with market discount must treat any gain recognized on the satisfaction of such Claim as ordinary income to the extent that it does not exceed the market discount that has already been accrued with respect to such Claim. There may also be state, local or foreign tax considerations applicable to particular holders of Claims, none of which are discussed herein.  **Holders of Claims should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan.**

### (ii)    Holders of Disputed Claims

Although not free from doubt, holders of Disputed Claims should not recognize any gain or loss on the date that the assets are transferred to the Disputed Claims Reserve, but should recognize gain or loss in an amount equal to: (i) the amount of cash and the fair market value of any other property actually distributed to such claimant (other than any amounts attributable to accrued and unpaid interest) less (ii) the adjusted tax basis of its Claim (other than for accrued and unpaid interest).  Holders of Disputed Claims are urged to consult their own tax advisors regarding the taxation of their Disputed Claims and the timing and amount of income or loss recognized relating to the Disputed Claims Reserve.

### (iii)    Information Reporting and Backup Witholding

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the Tax Code's backup withholding rules, a U. S. holder may be subject to backup withholding at the applicable rate with respect to distributions or payments pursuant to the Plan, unless the holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct U. S. taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against holder's U. S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

### B.    Consequences to The Debtors

### (i)    Cancellation of Indebtedness Income.

Generally, the discharge of a debt obligation owed by a debtor for an amount less than the "adjusted issue price" (in most cases, the amount the debtor received on incurring the

obligation, with certain adjustments) gives rise to cancellation of indebtedness ("COD") income to the debtor, subject to certain rules and exceptions. However, when the discharge of indebtedness occurs pursuant to a plan approved by the Bankruptcy Court in a case under Title 11 of the Bankruptcy Code (e.g., a Chapter 11 case), there is a special rule under the Tax Code which specifically excludes from a debtor's income the amount of such discharged indebtedness (the so-called "bankruptcy exception"). Instead, certain of the debtor's tax attributes otherwise available generally must be reduced by the amount of the COD income that is excluded from the debtor's income. Such reduction of tax attributes generally occurs in the following order: (i) net operating losses and net operating loss carryovers (collectively, "NOLs"), (ii) general business credits, (iii) minimum tax credits, (iv) capital loss carryovers, (v) the tax basis of debtor's property (both depreciable and non-depreciable), (vi) passive activity loss and credit carryovers, and (v) foreign tax credit carryovers (although there is a special rule in the Tax Code which allows the debtor to elect to first reduce the tax basis of depreciable property before having to reduce NOLs and other attributes). Under current Income Tax Regulations, the availability of the "bankruptcy exception" in the context of a consolidated group is made on a "separate entity" basis and not on a "consolidated group" basis. In addition, with regard to tax attribute reduction in the context of a consolidated group, recently adopted Income Tax Regulations (1.1502-28) suggest a "hybrid" method of attribute reduction. Under these regulations, the tax attributes of the separate member having excluded COD income is first reduced, followed by a reduction of the tax attributes of the subsidiary members (to the extent of any stock basis reduction). Then, to the extent a member's excluded COD income exceeds that member's separate entity tax attributes, the consolidated tax attributes allocated to the other members are proportionately reduced. It is not clear to what extent the Debtors will have COD income under the Plan although the Debtors believe that any such COD income generated by the debt cancellation occurring pursuant to the Plan should be excluded from their income under the so-called "bankruptcy exception" assuming that the Plan is confirmed with respect to the Debtors. It is also not clear to what extent the Debtors' tax attributes (including its NOLs) will be reduced pursuant to the application of these rules.

### (ii)    Gain or Loss on Transfer/Sale of Debtors' Assets.

If there is a sale of the Debtors' assets, or some portion thereof, the Debtors will generally recognize gain or loss on the sale in an amount equal to the difference between the amount realized (generally, the amount of cash and the fair market value of any other property received plus liabilities of the Debtors' assumed by the buyer, if any) and the Debtors' tax basis in the assets sold. Such gain, if any, may be reduced (or eliminated) to the extent that the Debtors have sufficient NOLs.

## XII.    CONCLUSION AND RECOMMENDATION

The Debtors believe that the Plan is in the best interest of holders of all Claims and urge all holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their ballots, as applicable, so that they will be received by the voting deadline.

Dated: ~~October 17,~~November ___, 2013                    By: /s/ Troy Taylor

Troy Taylor
*Chief Restructuring Officer for Elcom Hotel & Spa, LLC and Elcom Condominium, LLC*

Dated:  ~~October 17,~~November __, 2013                    Respectfully submitted,

                                 **KOZYAK TROPIN & THROCKMORTON, P.A.**
                                 *Counsel for the Debtors*
                                 2525 Ponce de Leon Blvd., 9th Floor
                                 Miami, Florida 33134
                                 Tel.:   (305) 372-1800
                                 Fax:   (305) 372-3508
                                 E-mail:clc@kttlaw.com
                                             vfa@kttlaw.com

                              By: /s/ Corali Lopez-Castro
                                   Corali Lopez-Castro
                                   Florida Bar No. 863830
                                   Vincent F. Alexander
                                   Florida Bar No. 68114

| | Formatted: Spanish (Argentina) |
|---|---|

## CERTIFICATE OF SERVICE

    **I HEREBY CERTIFY** that on ~~October 17,~~November ___, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day via transmission of Notice of Electronic Filing generated by CM/ECF on all counsel of record or pro se parties who are authorized to receive electronically Notices of Electronic Filing in this bankruptcy case.

                              By: /s/ Corali Lopez-Castro
                                   Corali Lopez-Castro

4233.101/~~348575.4~~349713.3