UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| ELCOM HOTEL & SPA, LLC and | Case No. 13-10029-BKC-RAM |
| ELCOM CONDOMINIUM, LLC, | Case No. 13-10031-BKC-RAM |
| Debtors. _____/ | (Jointly Administered) |

**DECLARATION OF TROY TAYLOR IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS PURSUANT TO 11 U.S.C. SECTION 363, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

1. My name is Troy Taylor. I am president of Algon Capital, LLC d/b/a Algon Group ("**Algon**"). I make this Declaration in support of the Debtors' request for entry of the proposed *Order (A) Authorizing Sale of Substantially All of the Debtors' Assets Pursuant to 11 U.S.C. § 363, Free and Clear of Liens, Claims, Encumbrances and Interests; (B) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief*.

2. The facts set forth in this Declaration are personally known to me, unless otherwise stated, and, if called as a witness, I could and would testify thereto. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Auction Procedures Order (defined below).

3. On January 17, 2013, Elcom Hotel & Spa, LLC and Elcom Condominium, LLC (collectively, the "**Debtors**"), Elevation Communities, LLC, ANO, LLC, F9 Investments, LLC, Thomas Sullivan, 10295 Collins Avenue Hotel Condominium Association (the "**Hotel**

Association"), and 10295 Collins Avenue Residential Condominium Association (the "**Residential Association**," with the Hotel Association shall be referred to as the "**Associations**") filed a stipulation (the "**Stipulation**") [ECF No. 69], in which the Associations consented to the Debtors' retention of Algon and my retention as Chief Restructuring Officer ("**CRO**") for the Debtors.

4. On January 23, 2013, this Court entered an interim order authorizing the Debtors' retention of Algon and my retention as CRO for the Debtors, *nunc pro tunc* to January 14, 2013 [ECF No. 77]. The Court entered a final order authorizing my retention as CRO and the retention of Algon on February 7, 2013 [ECF No. 94].

5. As this Court is aware, the Debtors are owners of (i) certain property located on approximately five acres at 10295 Collins Avenue, Bal Harbour, Florida ("**One Bal Harbour**") described as the "Hotel Lot," "Spa Lot," and "Restaurant Lot" in the Declaration of Covenants, Restrictions, and Easements of 10295 Collins Avenue Tower in the Official Record Book 25985, pages 4506-4659, in the public records of Miami-Dade County (the "**Tower Declaration**"), and (ii) nine condominium units located on the Hotel Lot, as described in the Debtors' schedules (together, the property described in (i) and (ii) of this paragraph shall be referred to as the "**Property**").

6. During the bankruptcy, the Debtors contacted or had discussions with a total of eighty-seven (87) entities or individuals that expressed an interested in purchasing all or portions of the Property. Furthermore, I executed, on behalf of the Debtors, approximately forty-six (46) confidentiality agreements with parties who expressed an interest in pursuing a transaction for the purchase of the Property, or portions thereof. These parties were also provided a copy of the Debtors' Confidential Investment Memorandum (the "**Memorandum**").

2

7. I or others on behalf of the Debtors conducted approximately fifteen (15) tours at One Bal Harbour for parties who indicated they were interested in purchasing the Property.

8. The assets to be sold by the Debtors not only include real estate assets (the Property), but also include the Shared Facilities and the right to operate and manage the Hotel at One Bal Harbour.

*9.* On October 21, 2013, the Debtors entered into an asset purchase agreement (the "**APA**) for the sale of the Property and other assets of the Debtor to Stoneleigh Capital, LLC ("**Stoneleigh**"). On that same date, the Debtors filed a *Motion for Entry of Order (A) Approving Competitive Bidding and Sale Procedures; (B) Approving Form and Manner of Notices, (C) Approving Form of Purchase and Sale Agreement, (D) Scheduling Dates to Conduct Auction and Hearing to Consider Final Approval of Sale, Including Treatment of Executory Contracts and Unexpired Leases, (E)Authorizing Sale of Substantially all of Debtors' Assets Pursuant to 11 U.S.C. § 363, Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (F) Granting Related Relief* (the "**Auction Procedures Motion**") [ECF No. 375].

10. Prior to filing the Auction Procedures Motion and executing the APA with Stoneleigh, the Debtors received 2 *bona fide* letters of intent from parties who expressed an interest in being a stalking horse bidder for the potential sale of the Debtors' assets. The Debtors determined that the letter of intent from Stoneleigh was the higher and better offer, which is why the Debtors negotiated the APA with Stoneleigh and filed the Auction Procedures Motion seeking approval of the APA or a higher and better offer at an auction where Stoneleigh would be the stalking horse bidder (the "**Auction**").

11. The Court entered its Order Approving the Auction Procedures Motion (the "**Auction Procedures Order**") [ECF No. 418] on November 7, 2013.

3

12. In accordance with the Auction Procedures Order, I was advised by counsel that the Notice of Auction and a copy of the Auction Procedures Order was sent by first-class mail postage prepaid to the following: (a) all creditors or their counsel known to the Debtors to assert a lien (including any security interest), claim, right, interest, or encumbrance of record against all or any portion of the Purchased Assets; (b) the Office of the United States Trustee; (c) the Securities and Exchange Commission; (d) all applicable federal, state and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities that, as a result of the Sale, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Purchased Assets or have any known interest in the relief requested by the Auctions Procedures Motion; (e) the state and local environmental agencies in the jurisdictions where the Debtors own or lease real property; (f) counsel to the Proposed Purchaser; (g) counsel to the prepetition and post-petition secured creditors (collectively, the "**Secured Creditors**"); (h) the United States Attorney's office; (i) all parties in interest who requested notice pursuant to Bankruptcy Rule 2002; (j) all parties to any litigation involving the Debtors; (k) all counterparties to any executory contract or unexpired lease of the Debtors; (l) all other known creditors and interest holders of the Debtors; (m) all of the owners of the residential condominium units and all of the owners of the hotel condominium units; and (n) all potential bidders previously identified or otherwise known to the Debtors.

13. In accordance with the Auction Procedures Order, I have been advised by counsel that the Notice of Auction was published in the Daily Business Review and Miami Herald. The Notice of Auction was published on two separate occasions in each publication. I am advised by my counsel that a Notice of Filing Proof of Publication of Notice of Auction was filed with the Bankruptcy Court on November 26, 2013 [ECF No. 476].

14. I have been advised by my counsel that the Cure Notice was timely served by first class mail or hand delivery on all non-Debtor parties to the Scheduled Contracts. The Cure Notice identified the Scheduled Contracts and provided the cure amounts that the Debtors believe must be paid to cure all prepetition defaults under the Scheduled Contracts. Objections to the Cure Notice were filed by the Residential Association, the Hotel Association, and numerous individual hotel condominium unit owners (collectively, the "**Cure Notice Objections**").

15. After filing the Auction Procedures Motion, the Debtors contacted (and was contacted by) additional parties regarding their potential interest in participating in the Auction. The Debtors executed forty-six (46) confidentiality agreements, twelve (12) of which were executed after the Debtors filed the Auction Procedures Motion.

16. All prospective acquirers of the Purchased Assets and/or investors were afforded the opportunity to conduct a reasonable due diligence review in a manner no less favorable than that provided to Stoneleigh within the time frame set by the Bankruptcy Court.

17. The Bankruptcy Court conducted the Auction on December 4, 2013. Prior to the Auction, the Debtors determined that Stoneleigh, the Residential Association, and AZZAMIA, Hotels, LLC ("**AZZAMIA**") satisfied the requirements for Qualified Bidders as determined by the Auction Procedures and each was deemed a Qualified Bidder. Stoneleigh, the Residential Association, and AZZAMIA each had a designated representative attend and participate in the Auction.

18. At the conclusion of the Auction, AZZAMIA submitted the highest dollar amount bid in the amount of $13.5 million. The Residential Association submitted the second highest dollar amount bid in the amount of $13.4 million.

19. Notwithstanding the fact that AZZAMIA submitted the highest dollar amount bid by $100,000.00, pursuant to its consultation rights in the Auction Procedures, the Hotel Association requested that the Debtors declare the Residential Association's bid as the Prevailing Bid.

20. Ultimately, after consultation with the Hotel Association and concessions with regards to the APA made by the Residential Association, the Debtors agreed with the Hotel Association to declare the Residential Association's bid as the Prevailing Bid on several conditions, one of which is the withdrawal of the Cure Notice Objections and all other objections filed by the Associations and hotel condominium unit owners relating to the Sale and/or the assumption and assignment of the RMA's (the "**Sale Objections**"; and together with the Cure Notice Objections, the "**Objections**").  To the extent any Objections are not formally withdrawn, the Debtors believe that they are moot.

21. In addition, although the Debtors believe they are not contractually obligated to do so as a condition precedent to assuming and assigning the RMAs, as defined in the APA, or Closing, the Debtors have agreed to fund a segregated account in the amount of $1,089,263.15 (the "**FF&E Reserve Account**"), which represents the short-fall relating to rental management agreements which individual unit owners entered into with Elcom Hotel and/or WCI Communities, Inc. prior to the appointment of the Receiver (the "**Original RMAs**").  The Debtors are not assuming the Original RMAs and, as such, any amounts arguably due under the Original RMAs, including, but not limited to the funds to be deposited into the FF&E Reserve Account, were not included in the Cure Notice.  The funding of the FF&E Reserve Account will enable the Debtors to successfully transfer hotel operations to the Residential Association while maintaining stability and continuity in hotel services, which will foster the cooperation of the

hotel condo unit owners (the "**Hotel Condo Unit Owners**") which will benefit the Estates with regards to a timely Closing.

22. Other creditors will likely not be adversely affected by the Debtors' funding of the FF&E Reserve Account because any distributions to the Hotel Association and the Hotel Condo Unit Owners in these bankruptcy cases, including, but not limited to, under the Debtors' Revised First Amended Joint Plan of Liquidation of (the "**Plan**") [ECF No. 457], will be off-set against the amounts funded to the FF&E Reserve Account.  Although the Hotel Association and the Hotel Condo Unit Owners will not be subject to disgorgement in the event that their distribution in these bankruptcy cases is lower than the amount funded in the FF&E Reserve Account, the Debtors believe that resolution of the Objections and favorable changes to the APA (*i.e.*, eliminating the requirement of amendments to the RMAs and reducing the number of RMAs to be assumed and assigned from 95 to 92) will reduce the administrative costs associated with the approval of the Sale while, at the same time, greatly increasing the probability of closing the Sale, and the ability of the Debtors to proceed to confirmation of the Plan.

23. Neither the Residential Association, nor any of its owners, members, managers, officers, or employees, is an insider or affiliate of the Debtors, and the proposed sale is the product of an arms-length negotiation and transaction between the Residential Association and the Debtors.

24. The APA was negotiated at arm's length, in good faith, and with all parties represented by counsel.  At this time, I do not believe that any acts have occurred that would render a sale to the Residential Association voidable under section 363(n) of the Bankruptcy Code.

25. I believe that sound business justification exists for the Debtors to enter into the APA with the Residential Association and it is in the best interests of the Debtors estates and creditors.

## 28 U.S.C. § 1746 Declaration

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 6, 2013.

_____
TROY TAYLOR
*Chief Restructuring Officer for*
*Elcom Hotel & Spa, LLC and Elcom*
*Condominium, LLC*